**UNITED STATES of America**

v.

**Louis LANNI, Sr., Mary Maiale.**

**Crim. A. No. 70–126.**

United States District Court,
E. D. Pennsylvania.

Nov. 15, 1971.

Louis C. Bechtle, U. S. Atty., Robert C. Ozer, Philadelphia, Pa., for plaintiff.

Lester J. Schaffer, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. PRELIMINARY STATEMENT

Defendant Louis Lanni, Sr. ("Lanni"), Secretary-Treasurer of Teamsters Local 830, was convicted by a jury after a two-week trial of conspiracy and of violating section 302(b) of the Labor-Management Relations Act, 29 U.S.C. § 186(b) (1964). Section 302(b) makes it a crime for an employee representative or an officer or employee of a labor organization to receive or accept money from an employer whose employees he represents.[1] Defendant Mary Maiale ("Maiale"), Lanni's "girlfriend"[2] was convicted by the same jury of conspiracy. We have before us defendants' motion for judgment of acquittal, or, in the alternative, for a new trial. The principal, as well as most difficult question before us, is the propriety of the Court's charge to the jury as to the elements necessary to establish "receipt" by a labor leader of payments by an employer. This is apparently a case of first impression on the important question of whether or not it is necessary for the government to actually trace the funds into a labor leader's hands in order to sustain a conviction under section 302(b). Defendants have grounded their motion on a number of points in addition to the alleged error in the charge, and we will deal with each of them in this Opinion.

### II. THE FACTS OF RECORD

Surprisingly, there is relatively little dispute between the parties as to most of the facts in the record. All of the witnesses who testified were put on by the government; Lanni and Maiale did not take the stand and did not offer any witnesses. The disputed areas emerge from the cross examination and closing arguments, and we will comment *infra* upon the crucial areas of dispute as to the facts. Since, in considering a motion for judgment of acquittal, the evidence must be viewed in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Feldman, 425 F.2d 688 (3d Cir. 1970);

---

1. The government characterizes this as a "labor racketeering" charge. The Act, the language of which is set forth at pp. 1068, 1071 *infra*, requires that the employees involved be employed in an industry affecting commerce. The parties agree that Local 830's drivers and helpers are so engaged.

2. The defense agreed with the government that Lanni and Maiale are "boyfriend and girlfriend". The subject is discussed at length *infra* at pp. 1079, 1080.

United States v. Giuliano, 263 F.2d 582 (3d Cir. 1959), we will now set forth the facts adduced from the witness stand during the trial from which the jury could have made a finding of guilty.

During the period from sometime prior to 1967 and up to and including August 1968, Joseph D'Agata ("D'Agata") was an officer of the D'Agata National Trucking Company ("D'Agata National"), which employed as drivers and helpers members of Teamsters Local 830.[3] At the time of the events in question, and for many years prior thereto, Lanni was Secretary-Treasurer of Local 830. D'Agata testified that in the latter part of 1966 his father wished to retire from the management of D'Agata National, which had been a family operation, and thereupon, D'Agata looked for a new investor in the company. D'Agata spoke with his attorney, Morris Goldman, of the Philadelphia Bar, who indicated that Maiale would be willing to invest in D'Agata National. There followed a meeting in Goldman's office, at which time Maiale agreed to invest approximately $33,000 in D'Agata National in return for a 25% stock ownership. Maiale was to be employed by D'Agata National as its bookkeeper at a salary of $150 a week. Lanni, according to D'Agata, took no part in these negotiations, but was aware that Maiale was to become an investor.

Beginning on January 1, 1967, Maiale was in fact put on D'Agata National's payroll as a bookkeeper at $150 a week.[4] On April 1, 1967, Lanni, who was like a "father" to D'Agata, suggested that D'Agata and his brother should draw $50 a week more for their salary because business was better and because they "deserved it", and Maiale's weekly salary was also increased by $50 to $200. How-

ever, from the time of the first paycheck until the last paycheck on August 2, 1968 (a nineteen-month period), Maiale never performed any bookkeeping services for D'Agata National, or any other services, and never invested any money. Maiale did not even go to D'Agata National to pick up her check; it was mailed to her every Friday. She then deposited these checks into her own bank account. The payments were reported to the federal government on W–2 forms for the years 1967 and 1968. During this entire period, Maiale was employed as a full-time bookkeeper for Local 830's Health and Welfare Fund. Lanni was aware that Maiale performed no services for D'Agata National.

While there finally came a time when D'Agata realized that Maiale was not going to invest in D'Agata National[5] and was not going to perform bookkeeping services, he nonetheless continued to send her a weekly check because during this period he had a good relationship with the union, business picked up, he got new customers, and because:

"I knew Mary was very close to Lou [Lanni], and I figured, you know, keep everything happy. I am not going to disturb nothing because I was doing good." (N.T. 142).

D'Agata soon became known as "Lou Lanni's boy." During the period he was paying Maiale, Lanni and Maiale would go to D'Agata National's offices to visit D'Agata several times a week, whereas prior to 1967, they never came to see D'Agata.

One of the significant factors in the sudden improvement of D'Agata National's business was the acquisition of a portion of the overflow beer hauling business of C. Schmidt & Sons, a major

3. D'Agata is named in the indictment as a co-conspirator, but not as a defendant.

4. The first check was not mailed to her until March 31, 1967, when she received a gross pay of $2100 representing three months' salary. D'Agata testified that he did not pay her until then because

D'Agata National was short of funds due to its new incorporation expenses.

5. D'Agata's "explanation" was that he was supposed to put certain real estate into the business and that when he was unable to do so, Maiale signified that she would not invest any money.

Philadelphia brewery.[6] According to the testimony of Charles McDevitt, Schmidt's Director of Transportation, Lanni called McDevitt in January or February of 1967 and told him to employ D'Agata's firm for its Wilmington deliveries, and to replace the firm it had previously used for these deliveries. McDevitt related that Schmidt's employed D'Agata National because Lanni, through his power over the union membership, was capable of shutting down its plant, and Schmidt's believed that he would be likely to do so if it did not accommodate his request.[7] McDevitt stated that, in the past, Lanni had shut down the plant by pulling the men off the platforms when Schmidt's refused to accede to his wishes.

Francis J. Tomlinson, the business agent for Local 830 and a member of its executive board during the period from January 1967 through August 1968, testified to conversations he had overheard between Lanni and others at the Local's office and to certain events that occurred there. Every night when Lanni was ready to close the office, Lanni would call his chauffeur over and say, "Come on, John, let's take a ride down to D'Agata's and see what's happening." Sometimes Lanni would make comments such as:

> "Come on, John, let's go down. I got to get some money. I am tired of promises. That's all I am getting out of him. His stories. I need 'tin' off of him tonight."

Lanni's nightly routine continued for about five weeks in the beginning of 1967. Thereafter, Lanni would see Tony D'Roso, shop steward at D'Agata National, who would keep Lanni informed of every occurrence at D'Agata National. D'Roso would make a daily report to Lanni and visit the Local's hall two or three times a week. During one of the conversations between Lanni and D'Roso, D'Roso told Lanni that a driver had "flipped over" one of D'Agata National's trucks in New Jersey, whereupon Lanni replied:

> "Jesus Christ, I told him to get rid of that bum. He is ruining us. Doesn't he know that all that equipment costs money? What does he think we do—get all that equipment for nothing? That costs money."

In order to establish Lanni's and Maiale's financial inter-dealings, the government introduced evidence that, in early 1968, while Maiale was still receiving payments from D'Agata National, she and Lanni went to Miama, Florida to purchase a condominium in an apartment building there. Mary Agnes Schwartz, the sales agent of the condominium seller, James T. Barnes Mortgage Co., testified that Lanni told her that the apartment would be titled in Maiale's name, but that, in order for Maiale to qualify for a mortgage on the property, he would transfer funds to Maiale's account in a local bank. A notation on the mortgage application stated, "Mr. Lanni is putting up equity for [apartment] 502. Mary Maiale." Lanni also inquired about the availability of free boat dock space at the condominium, and had Schwartz insert a clause into the purchase agreement giving the purchaser the exclusive right to dock the boat at no extra cost. However, Lanni, not Maiale, owned a boat. Maiale signed the purchase agreement and the mortgage, and gave Schwartz her check for $500 representing a deposit on the apartment. The defense conceded that Lanni and Maiale shared the apartment.

F.B.I. Special Agent Lawrence Carl York testified that, in connection with the investigation of the case, he audited the account at Fidelity Bank into which Maiale deposited her weekly paychecks

---

6. While Schmidt's owns one large fleet of trucks, it utilizes private trucking companies for excess or overflow hauling.

7. Lanni's contention contra was that he asked Schmidt's to employ D'Agata National rather than the Wilmington trucking firm because of a jurisdictional dispute between two local unions over which local's drivers should get the business from Philadelphia.

from D'Agata National, and found that Maiale paid the down payment on the Miami apartment by drawing a check (government exhibit #7) from this account to James T. Barnes Mortgage Co. York also uncovered in his investigation the bill of sale emanating from Lanni's sale of the boat. It recited that Lanni was the owner and seller of the boat and that his address was the condominium apartment.

One final point in connection with the Miami apartment was furnished by Tomlinson's testimony. Tomlinson testified that at the union's membership meeting in January 1969, shortly after Lanni had been elected to another term as Secretary-Treasurer of Local 830, Lanni took the stage, related how he had taken some union stewards down to *his* apartment in Miami, and said, "Tell the boys how you enjoyed your trip to Florida, how you enjoyed your victory trip down my place in Florida."

In addition to showing Lanni's and Maiale's close personal relationship and their interrelationship concerning the Miami apartment, the government introduced evidence to show that the two defendants had had other business dealings and that in them Maiale was a "straw man" for Lanni. Over the defendants' objection, and subject to a limiting instruction in the charge (see pp. 1080, 1081 *infra*), the testimony of one Carl Maier was introduced. Maier, a partner in a garage business, testified that in July 1967, one of his partners, Lewis Bertucci, introduced him to Lanni and to Gordon Grubb, the latter being President of Local 830, for the purpose of discussing formation of a truck leasing company. Together with Maier, Grubb and Lanni agreed to be the principals in the corporation, and they were each to receive one-third of the stock. Shortly thereafter, a second meeting was arranged at the office of Morris Goldman, Esq., who had previously arranged the meeting between Maiale and D'Agata, for the purpose of drawing up the formal docu-

ments. Maiale was present at the meeting, along with Goldman, Lanni, Grubb and Maier, and when the documents were signed and the corporation·formed, the shareholders were Maier, Maiale (holding Lanni's interest) and Linda Nawrocki (Grubb's daughter, holding Grubb's interest). It was decided at that time that Maiale would do nothing in the corporation other than be one of the check signers. Maier also testified that in August 1967, he again met with Lanni and Grubb (Maiale, Bertucci and attorney Goldman were present), this time to discuss the possibility of forming a realty company, and that someone at the meeting indicated that, while Maiale would become a shareholder of record, she would act solely as a "straw name" in the corporation.[8]

In the government's view, the foregoing facts permitted the jury to conclude that Maiale served solely as a "straw man" for Lanni in Lanni's business and financial arrangements, and that Maiale received the $16,300 from D'Agata National for Lanni's use or benefit, including the purchase of their shared Florida apartment. Maier's testimony and the testimony pertaining to the Florida apartment were used to show that what was nominally Maiale's was, in reality, Lanni's. The government advanced the testimony concerning Lanni's and Maiale's visits to D'Agata, and Lanni's daily conversations with D'Agata National's shop steward as corroborative of Lanni's personal and financial interest in D'Agata National. The testimony of McDevitt and D'Agata was offered to show Lanni's modus operandi for benefiting D'Agata National after Maiale was placed upon its payroll, *i. e.*, use of the tremendous power that Lanni had over the Teamsters in Local 830 to coerce Schmidt's to employ D'Agata National for overflow hauling.

In order to corroborate the evidence of Lanni's power and of its improper use to benefit D'Agata National and ultimately himself, the government intro-

8. There is nothing in the record to indicate whether or not the proposed realty company ever materialized.

duced evidence of the circumstances surrounding the termination of the D'Agata National-Maiale relationship, including the use by Lanni of his power to destroy D'Agata National after there had been a "falling out" between Lanni and D'Agata which D'Agata blamed on the fact that Lanni had made a "deal" with one William H. Pflaumer. A summary of that evidence is as follows.

During the summer of 1968, D'Agata National began to experience a loss of customers. Of particular concern was the loss of the Schmidt's business. The government and the defense differ as to the reasons for the loss of the Schmidt's business. However, there is evidence in the record that the reason for Schmidt's decision to drop D'Agata National was a telephone call received by McDevitt from Lanni telling him to stop loading D'Agata National and to start using another trucking company instead. McDevitt testified that he desired to continue using D'Agata National because its service and rates were good, but Lanni threatened to shut down Schmidt's and prevent the Teamsters from loading at Schmidt's platform; as a result, McDevitt was forced to comply with Lanni's request. After learning of this, D'Agata threatened to obtain an injunction against Schmidt's. Schmidt's lawyers then contacted D'Agata and Lanni, and it was finally agreed that D'Agata National would be able to haul from Schmidt's brewery for five of its long-standing customers, but that D'Agata National would still not be given any of Schmidt's regular overflow business. Although Lanni signified to McDevitt that he did not care which hauling company Schmidt's used, as long as it was not D'Agata's, Schmidt's started using Pflaumer's trucking company, after Pflaumer showed Schmidt's what purported to be an I.C.C. approved tariff. This tariff proved to be spurious, having never been approved by the I.C.C.; yet, even after the discovery of the spurious tariff, Schmidt's continued to use Pflaumer's company and pay higher rates because it could not use D'Agata for fear of a shutdown.

Tomlinson confirmed McDevitt's testimony and related certain events preceding the Schmidt's termination. During the summer of 1968, one Donnelly, an employee of Schmidt's at its Norristown brewery, became involved in an argument with D'Agata and D'Agata threatened to kill him. Schmidt's thereupon stopped loading D'Agata National's trucks at Norristown, and within a day or so, also stopped loading its trucks at its main plant in Philadelphia. Schmidt's refused to tell D'Agata why it would not load his firm's trucks, but suggested he get in touch with the union. D'Agata called the union and spoke to Tomlinson, who told him that the drivers would not load his firm's trucks unless he gave them a raise. When D'Agata agreed to the raise, Tomlinson told him that the drivers would no longer deliver straight to the terminals and that D'Agata would have to change drivers and put in new drivers before entering the terminals. Thus, D'Agata National would have to pay two shifts of drivers to conduct the same operation that was previously conducted with one shift of drivers. The practical effect of this demand was to double D'Agata National's labor costs, and to threaten the firm's survival. Tomlinson testified that he was under instructions from Lanni, who was in Florida at the time, to provoke the drivers into striking D'Agata National, and that he knew that by ordering the drivers not to deliver directly to the terminals, D'Agata National's business would be "crippled". McDevitt testified that the Donnelly incident had nothing to do with D'Agata's trouble with Schmidt's. He stated that the incident was resolved within a very short period of time during which D'Agata apologized to Donnelly.

D'Agata blamed the loss of the Schmidt's business on Lanni, who, he claimed, had made a "deal" with Pflaumer. Pursuant to his belief, D'Agata spoke to Lanni and a meeting was ar-

ranged at a suburban Philadelphia restaurant among D'Agata, D'Agata's brother, Lanni and Pflaumer. Pflaumer suggested the creation of a new trucking company, secretly owned by both Pflaumer and D'Agata, who, in collusion, would tie up the beer trucking business and raise prices to everyone. Unhappy with this proposal, D'Agata became angry and left the meeting. Thereafter, as evidenced by the financial records, D'Agata National's business became progressively worse, and D'Agata began making open statements to the effect that Lanni had "made a deal" with Pflaumer. Another meeting was then held at attorney Goldman's office, attended by D'Agata, D'Agata's father and brother, Lanni and Maiale. D'Agata repeated his accusations. Lanni thereupon called D'Agata a "whore", told him "You are out of business", and walked out of the meeting. On Friday, August 9, 1968, a week after the meeting in Goldman's office, D'Agata mailed a weekly paycheck to Maiale who mailed it back to him unopened. Thereafter, D'Agata ceased mailing checks to Maiale.

The defendants, in their theory of the case, accept the incontrovertible fact of Maiale's receipt of $16,300 from D'Agata National. They argue, however, that these payments were made in connection with a legitimate business arrangement between D'Agata and Maiale which soured and was never consummated. They contend that Lanni never received any of the money and that there was no agreement among Lanni, Maiale and D'Agata that the funds were to be received by Lanni. Defendants reason that the government's case is founded essentially upon D'Agata's beliefs (1) that by paying Maiale, he would curry favor with Lanni; and (2) that D'Agata National would consequently benefit in the form of better labor relations and more business because shippers prefer to deal with truckers who are blessed with good labor relations and therefore are less likely to suffer interruptions in service. Defendants say that these beliefs (and motives) may well have been corrupt; however

they submit that such facts and circumstances do not add up to an agreement to violate section 302 of the Labor-Management Relations Act.

Having outlined the facts of record, we come to the Court's interpretation of section 302 as reflected by its charge to the jury. We will then turn to the question of whether the record facts make out a sufficient case to sustain a conviction and to the other assignments of error.

III. THE COURT'S CHARGE AS TO THE ELEMENTS NECESSARY TO ESTABLISH RECEIPT UNDER SECTION 302 OF THE LABOR-MANAGEMENT RELATIONS ACT

A. *Introduction*

The government did not prove and did not attempt to prove by direct evidence that Lanni received any money from D'Agata National. The government and the defense disagreed on what the Court's charge on "receipt" should be, and on whether there was enough evidence on the question of receipt to go to the jury. The defendants contended that, under the Act, the government would not make out a case until it showed actual receipt by Lanni, *i. e.*, the money in his hands, and they urged the Court to charge accordingly. The government sought what we refer to as a Hobbs Act charge (see pp. 1071–1072 *infra*) to the effect that if Lanni had directed or suggested that D'Agata National make payment to Maiale, the jury could convict regardless of actual receipt by or benefit to Lanni himself.

During the course of the trial, we carefully examined the legislative history in an attempt to assess the intent of Congress in enacting and amending section 302. As the record reflects, we engaged in lengthy colloquies with counsel to get the benefit of their views on the subject. While the determination was not a simple one, we formulated a charge which lies in middle ground but which is, in point of fact, a good deal closer to what Lanni and Maiale sought than what the

**1068**

government sought. In formulating the charge, we heeded the common-sense principle, particularly apposite in this case, that the Court must give the jury guidance by relating its instructions to the actual facts of the case, rather than merely stating the law in the abstract. See Choy v. Bouchelle, 436 F.2d 319 (3d Cir. 1970); McNello v. John B. Kelly, Inc., 283 F.2d 96 (3d Cir. 1960).

## B. The Language of the Act and the Language of the Charge

Section 302 of the Labor-Management Relations Act, 29 U.S.C. § 186 (1964) states in pertinent part:

"(a) It shall be unlawful for any employer * * * to pay * * * any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

\* \* \* \* \* \*

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

(b) (1) It shall be unlawful for any person to * * * receive, or accept * * * any payment, loan or, delivery of any money or other thing of value prohibited by subsection (a) of this section."

In construing this section of the Labor-Management Relations Act, as it applied to the receipt of funds by a labor leader, the Court charged the jury as follows:

"However, the crucial question again is what is meant by receiving or accepting the money.

Now, I instruct you that if based upon the direct and circumstantial evidence in this case you find beyond a reasonable doubt that Mr. Lanni actually received or accepted in his possession the sums paid by D'Agata to Miss Maiale, then that aspect of the Labor-

Management Relations Act which requires acceptance or receipt has been met. And you may, if all other requisites of proof under the Act as I will define them to you have been met, you can make a finding of guilt. If you find based on all the evidence and beyond a reasonable doubt that Mr. Lanni actually received or accepted in his possession these sums paid by D'Agata to Maiale, then that aspect of the Act is met.

However, I also instruct you that the requirements of Section 186 of the Labor-Management Relations Act concerning acceptance and receipt by an employee representative or officer of a labor organization are also met, if, based upon the evidence in the case, you find beyond a reasonable doubt that money paid by an employer is received or accepted by someone who is the agent, intermediary, go-between or front for the employee representative or officer of a labor organization.

Now, in order, however, for one to be an agent, intermediary, go-between or front, it is essential that the parties to the transaction contemplate that the agent, intermediary, go-between or front is to receive the payments on behalf of the employee representative or labor union officer, with the further contemplation that the monies be available to or transmitted like a conduit to the employee representative or labor union officer, or that the parties contemplate that the money be received and held for his use.

In this case, therefore, in order to meet the acceptance and receipt aspect of Section 186, you must find from all of the evidence and beyond a reasonable doubt that the monies paid by D'Agata National to Mary Maiale were paid to her as agent, intermediary, go-between or front for Mr. Lanni. In order for you so to conclude, and that is, in order for you to conclude that she was an agent, intermediary, go-between or front for Mr. Lanni, you must first find beyond a reasonable doubt that Mr. D'Agata,

Miss Maiale and Mr. Lanni contemplated that Miss Maiale was receiving payments on behalf of Mr. Lanni in contemplation that the monies be available to him or be transmitted to him like through a conduit; or that Mr. D'Agata, Miss Maiale and Mr. Lanni contemplated that the monies be received and held by Miss Maiale for Mr. Lanni's use. And if you so find beyond a reasonable doubt—well, let me say this: If you so find beyond a reasonable doubt, then the acceptance and receipt provisions of 186 are met. And if you do not so find beyond a reasonable doubt, then you must find the defendants not guilty."

### C. *The Legislative History*

The Labor-Management Relations Act of 1947 (the Taft-Hartley Act), 29 U.S.C. § 141 et seq. (1964), was enacted by Congress as an amendment to the then existing National Labor Relations Act (the Wagner Act). Taft-Hartley was passed in response to congressional concern over the growing power of labor unions and numerous strikes and secondary boycotts which had then occurred throughout the nation. Section 302, which restricted and prohibited employer payments to unions, arose specifically out of congressional response to a strike the previous year by the United Mine Workers Union, in which the union demanded from the employers that a tax of ten cents a ton on coal be paid to the union for indiscriminate use in its so-called welfare funds. *See* S.Rep.No.105, 80th Cong., 1st Sess. 52 (1947); 93 Cong. Rec. 4876 (1947) (remarks of Senator Taft).

While payments to union welfare funds, which had been used as "war chests" in the event of a strike, was one reason for passage of section 302, the Supreme Court's opinion in United States v. Ryan, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956), indicates that section

302 was also meant by Congress to be a broad prohibition against employer bribes to union officials. Mr. Justice Clark, speaking for the Court, stated, *inter alia:*

"Nor can it be contended that in this legislation Congress was aiming solely at the welfare fund problem. Such a suggestion is supported neither by the legislative history nor the structure of the section. The arrangement of § 302 is such that the only reference to welfare funds is contained in § 302(c) (5). If Congress intended to deal with that problem alone, it could have done so directly, without writing a broad prohibition in subsections (a) and (b) and five specific exceptions thereto in subsection (c), only the last of which covers welfare funds. As the statute reads, it appears to be a criminal provision, *malum prohibitum,* which outlaws all payments, with stated exceptions, between employer and representative. * * * As passed by the House of Representatives, the Hartley Bill forbade employer contributions to union welfare funds, and made it an unfair labor practice to give favors to 'any person in a position of trust in a labor organization * * *.' H.R. 3020, 80th Cong., 1st Sess., § 8(a) (2). The scope of this bill was enlarged when it reached the Senate to include, in the words of Senator Taft, a 'case where the union representative is shaking down the employer * * *.' 93 Cong.Rec. 4746. The resulting Senate amendment made it criminal both for the employer and the 'representative' of employees to engage in such practices." *Id.* at 305, 76 S.Ct. at 404.

In 1959, Congress passed the Labor-Management Reporting and Disclosure Act (the Landrum-Griffin Act), which amended section 302 of Taft-Hartley.[9]

---

9. Section 302 originally read as follows:
    "(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of

any of his employees who are employed in an industry affecting commerce.
    (b) It shall be unlawful for any representative of any employees who are employed in an industry affecting com-

The principal purpose of the amendment was to make payment to unions by management middlemen, generally known as "labor consultants", violative of the act without proof that the employer had authorized or ratified the middleman's payments. However, the legislative history indicates that the congressional purpose was not limited to correcting the abuses stemming from the management-middleman situation. According to the Senate Committee on Labor and Public Welfare, the amendment:

> "strengthens section 302 of the Labor-Management Relations Act *by making it applicable to all forms of extortion and bribery in labor-management relations some of which may slip through the present law.*" S.Rep. No. 187, 86th Cong., 1st Sess. 13 (1959) (emphasis added) U.S.Code Cong. and Admin.News, p. 2329.

The same committee also declared that:

> "The amendments contained in this section would remove any doubt that *all forms of bribery and extortion which might escape the provisions of existing law would be prohibited under pain of criminal penalties.*" *Id.* at

43 (emphasis added) U.S.Code Cong. & Admin.News, p. 2360.

The House of Representatives Committee on Education and Labor reported that the "purpose of these amendments to section 302 is to forbid any payment, loan or bribe by an employer * * *." H.Rep.No.741, 86th Cong., 1st Sess. 47 (1959) U.S.Code Cong. & Admin.News, p. 2469. We find these congressional committee reports to be probative on the intent of the Congress in amending section 302, and in passing it originally as well. *Cf.* United States v. Ryan, *supra.* However, it is section 302(b) as amended that Lanni and Maiale are charged with violating.

In the Landrum-Griffin Act, in addition to amending section 302, Congress added reporting and disclosure sections which required union representatives to file annually with the Secretary of Labor a signed report listing any assets or income received by the union representative, his spouse or minor child, directly or indirectly from an employer whose employees he represents. Labor-Management Reporting and Disclosure Act, § 202, 29 U.S.C. § 432 (1964). A similar section required employers to report

---

merce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value."

The 1959 amendments added three new subdivisions [(2), (3), and (4)] to section 302(a) and made these sections applicable to 302(b) by relation back. The amended section reads as follows:

"(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

(b) (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section."

The amendment thus broadens the scope of the Act.

payments to a union representative, his spouse or minor child. Labor-Management Reporting and Disclosure Act, § 203, 29 U.S.C. § 433 (1964). According to then Secretary of Labor James P. Mitchell, in a report read into the Congressional Record by the late Senator Everett Dirksen:

> "*The administration bill, through the combined effect of its broad reporting requirements [sections 202 and 203] and its prohibitions on bribery and improper payments between employers and unions and their officials [section 302], is designed to eliminate the abuses found with respect to collusion between employers and unions.* Employers and unions will be hesitant to engage in the schemes which have been shown to exist in the past because their dealings could no longer be cloaked in secrecy. The bright glare of publicity and the information union members would obtain about the financial affairs of their unions, as well as about the dealings of their union officials and employers, would enable the members to protect their own interests, as well as the assets of their labor organizations." 105 Cong. Rec. 1566 (1959) (emphasis added).

It is clear from the amendment to section 302 that Congress was concerned, *inter alia,* about payments to a union representative by someone other than the employer, *i. e.,* a management middleman. In the amendment to section 302 itself, Congress did not address in so many words the question of payments by or on behalf of an employer, to someone other than the labor union representative himself, *i. e.,* to someone receiving it on the union leader's behalf. And while the question posed by this case of whether section 302 forbids indirect receipt by a labor leader appears to be one of first impression, it is our view: (1) that the legislative history provides a clear guide to construction of the statute; and (2) that, in view of the committee reports, a narrow construction of the section is im-

proper. However, before articulating our position, we will first consider the theories of construction of the statute advanced by the government and the defense.

**D.** *The Government's Position—The Hobbs Act Interpretation*

The Hobbs Act, 18 U.S.C. § 1951(a) (1964), provides:

> "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

The Hobbs Act was passed by Congress to fill a gap in the Anti-Racketeering Act, which excluded from its prohibitions union extortion to secure wages and "make work" for its members. According to the Supreme Court in United States v. Green, 350 U.S. 415, 419, 76 S.Ct. 522, 525, 100 L.Ed. 494 (1956), "The legislative history makes clear that the new Act was meant to eliminate any grounds for future judicial conclusions that Congress did not intend to cover the employer-employee relationship."

Subsequent to the *Green* decision, the Third Circuit was called upon to decide the issue of whether a defendant must actually receive the monetary proceeds of his extortion in order to violate the Hobbs Act. In United States v. Provenzano, 334 F.2d 678 (3d Cir.), cert. denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964), the facts established that the defendant, a union official, had coerced and extorted funds from an employer whose employees he represented. However, at the defendant's suggestion, the employer paid the funds to the defendant's attorney rather than to the defendant.[10] There was no evi-

---

10. The *Provenzano* facts are similar to the facts involved here to the extent that the funds paid to the attorney were pur-
portedly for services, but no services of any consequence were ever performed.

dence to show that the attorney ever turned the funds over to the defendant, or, for that matter, ever intended to. The defendant appealed his conviction, arguing that the Hobbs Act is not violated unless there is evidence to show that the extortioner has actually received the funds. Rejecting this argument and affirming the conviction, the court held that extortion does not depend upon having a direct benefit conferred upon the person who commits the extortion, and that the gravamen of the offense is the loss to the victim. The court noted that "it is enough that payments were made at the extortioner's direction to a person named by him." *Id.* at 686.

In the instant case, the government argues that the *Provenzano* construction of the Hobbs Act should be equally applied to section 302 of the Labor-Management Relations Act. Thus, according to the government, Lanni would be guilty of violating section 302 if there were sufficient evidence for the jury to infer that D'Agata National paid money to Maiale at Lanni's "suggestion" or request, even absent any showing that Lanni ever received the funds, or any benefit from them.

The government buttresses its application of the *Provenzano* rationale to section 302 of the Labor-Management Relations Act in several ways. First, the government notes that section 302 and the Hobbs Act are both directed at wrongful conduct by an employee representative vis-a-vis an employer. Second, in view of the broad language of the committee reports which show that the amendments were intended to make the Labor-Management Relations Act applicable to "all forms of bribery and extortion in labor-management relations", the government argues persuasively that it defeats the congressional intent to permit a union representative to deal corruptly with an employer and yet escape conviction because the bribe paid by the employer reaches the pocket of someone designated by the union representative rather than that of the union representative himself. However, we will opt for

a narrower construction than does the government, as will presently be seen.

E. *The Defendants' Position—That Proof of Actual Receipt is Required and That if it is Not, Section 302 is Unconstitutionally Vague.*

Section 302(b) makes it unlawful for any person to accept or receive any money or other thing of value. The position of defendants is that this language must be strictly construed and that in order to establish a violation of section 302, it is necessary to prove that the funds actually passed into the union representative's hands. Under this view, a payment to Maiale, regardless of the circumstances, would be insufficient to sustain a guilty verdict, and the case should never have gone to the jury because the government failed to prove that D'Agata gave Lanni any money. Defendants contend that if Congress had intended to prohibit indirect payments, it would have incorporated the words "direct or indirect" into section 302(b), as is done in the bribery statute, 18 U.S.C. § 201.

Defendants also point to the reporting section of the Landrum-Griffin Act, 29 U.S.C. § 432 which requires a union official to report to the Secretary of Labor "any * * * interest * * * which he or his spouse or minor child directly or indirectly * * * derive[d] * * * from, an employer." They argue that had Congress intended to prohibit *indirect* payments to an employee representative, it would have incorporated the words "direct or indirect" into section 302 as it did in the reporting section, which was passed at the same time.

As we have already indicated, we read the congressional intent as a broad one, hence our rejection of the narrow reading of "receipt". Moreover, we find the analogy to the reporting section of Landrum-Griffin to be a doubtful aid to defendants' cause. If section 302 and the reporting section are read together, the reporting section may be said, in view

of Secretary Mitchell's report (see p. 1071 *supra*), to corroborate the broad intent to reach indirect payments. However, even if this conclusion is not drawn, the absence of the words "direct or indirect" does not require the narrow reading sought by defendants of a separate and distinct part of the statute. The failure in drafting to spell out every possible contingency does not deprive a statute of its plain import, which we have no difficulty in apprehending.[11]

Finally, defendants maintain that any construction put upon section 302, other than one which prohibits actual receipt of funds by the union representative, would make the statute unconstitutionally vague in violation of the due process clause of the Fifth Amendment. This follows, it is said, because there is nothing in the language of the statute that would put a person on notice that payment by D'Agata National to Maiale, who is not an employee representative, would be a criminal act. Defense counsel contends that if Lanni had inquired of him prior to the events in question as to whether payments to his girlfriend Maiale against the background of this case would violate section 302, he might, after reading the statute, have given a negative response.

■ It is a well-established principle of constitutional law, which recent Supreme Court decisions have reaffirmed, that due process requires that a criminal statute be sufficiently narrowly drawn to give "a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." Palmer v. Euclid, 402 U.S. 544, 545, 91 S.Ct. 1563, 1564, 29 L.Ed.2d 98 (1971); United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." Palmer v. Euclid, *supra;* United States v. Harriss, *supra. See also*

Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); Bouie v. Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); Wright v. Georgia, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963).

In United States v. Ryan, 128 F.Supp. 128 (S.D.N.Y.), rev'd, 225 F.2d 417 (2d Cir. 1955), rev'd, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956), the defendant, a union officer, attacked his indictment under section 302(b), contending that a construction of the words "representative of employees" to include individuals other than the collective bargaining agent made the statute void for vagueness. The court, in rejecting the defendant's argument, noted that the defendant, as a union official, was one of the most important individuals representing the employees, and that any reasonable person would understand that the statute encompassed a union official as well as the union itself.

■ We have no difficulty in concluding that had Lanni asked his attorney whether the conduct with which he is charged in the instant case violated the Act, he would have received an affirmative answer and that he had reasonable notice of the charges within the meaning of the *Palmer, Harriss* and *Coates* cases, *supra.*

**F.   *Rationale of the Court's Charge***

■ The instructions which the Court gave to the jury were that the element of receipt would be established if the jury believed that Maiale received the funds from D'Agata National as "agent, intermediary, go-between, or front" for Lanni, and that for them so to conclude, it would be necessary for them to find beyond a reasonable doubt that D'Agata, Maiale and Lanni contemplated that Maiale was receiving payments on Lanni's behalf in contemplation that the monies be available to him or transmitted to him like through a conduit or that the trio contemplated that the monies be re-

---

11. While the question is not before us, in view of the language of United States v. Ryan, *supra,* we think that the result in this case would have been no different had section 302 not been amended.

ceived and held by Maiale for Lanni's use. While this charge represents a sort of middle ground between the broad (Hobbs Act) interpretation sought by the government, and the narrow (strict proof of receipt) interpretation sought by defendants, it is far closer to the defendants' proposed construction than that of the government. Our formulation might even be said to be tantamount to requiring actual receipt. It also represents an effort to give the jury guidance by relating the definition of receipt to the facts of the case, rather than positing it as an abstract notion.

Why do we reject defendants' narrow view? As we have said, we do so because we believe that when Congress passed a bill which its committees reported had as its purpose the elimination of "all forms of bribery in labor-management relations" and "abuses found with respect to collusion between employers and unions", its intent was a broad one and that it did not intend that a scheme whereby money paid by an employer under circumstances described in the language of our jury charge was beyond its decree. Moreover, as we have also said, the 1959 amendments to section 302, which made indirect employer payments through a management middleman a violation of the Act without proof of an agency between the employer and middleman, indicate Congress' concern with indirect, as well as direct payments.[12] Upon reflection, we feel that there is a stronger basis for the government's Hobbs Act construction than we did during the crucible of trial. However, because we are dealing with a criminal statute, we have taken a more cautious course and have adopted a construction which, while giving full breadth to the concept embodied in the word "receipt", has not gone beyond that concept to encompass mere designees.

12. It can also be argued (see pp. 1072, 1073 *supra*) that if section 302 and the Landrum-Griffin reporting section are read together, they may, in view of Secretary Mitchell's report, be said to corroborate the broad intent to reach indirect payments.

The caselaw also supports the position that the term "receipt" was meant to be broadly, rather than narrowly, interpreted. In United States v. McMaster, 343 F.2d 176 (6th Cir.), cert. denied, 382 U.S. 818, 86 S.Ct. 42, 15 L.Ed.2d 65 (1965), the court affirmed a conviction of a labor union official under section 302(b) where the evidence disclosed that an employer, rather than making any direct payments to the defendant, made payments to a corporation which was, in reality, controlled by the defendant. Analogously, we hold that section 302(b) is violated where the facts disclose that payment is made to a person who is, in reality, the agent of the labor union official as amplified by our charge to the jury.

## IV. WAS THERE SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION?

Defendants have alleged as error our refusal to direct a judgment of acquittal at the conclusion of the government's case on the basis that the evidence, as a matter of law, was insufficient to permit a jury to conclude beyond a reasonable doubt that the defendants were guilty of the acts charged.

The defendants contend that, at best, all the government's evidence proves is that D'Agata made payments to Maiale because good relations with the union were essential to the success of his business, and because he believed that such payments would please Lanni, thereby keeping him in good stead with Local 830. Defendants submit that there is no evidence that Maiale gave or intended to give these funds to Lanni, or that Lanni expected to benefit from them. Thus, they contend, the government has not even proved Lanni's *indirect* receipt of these funds, nor the existence of any conspiracy to violate the Act.[13]

13. Although the cases are clear that a defendant may be found guilty of the crime of conspiracy even though the evidence is insufficient to sustain a conviction of the substantive offense [*see, e. g.,* United States v. Vastine, 363 F.2d 853 (3d Cir. 1966) ; United States v. Marcone, 275

The defendants argue that the only evidence tending to show a violation of section 302 was Tomlinson's testimony that he overheard Lanni saying that he was going to see D'Agata to "get some tin". The argument continues that the only receipt of funds which the indictment refers to is the receipt of the $16,300 paid by check to Maiale, and that the Tomlinson testimony is, therefore, irrelevant to the crime charged in the indictment. Defendants further argue that the Maier testimony, the evidence concerning the apartment in Miami, and the use of Lanni's power as a union leader to benefit D'Agata National were not probative on the commission of a crime, and only served to muddy the waters. They contend that, at best, the evidence cast Lanni's moral and business character in a bad light, prejudiced the jury, and created a "vague suspicion" in each juror's mind that Lanni must have been guilty, which the jury implemented by its verdict.

■ It is, of course, fundamental that a person cannot be convicted of a crime on the basis of suspicion; the evidence must establish the defendant's guilt beyond a reasonable doubt. However, on a motion for judgment of acquittal following a conviction by a jury, the test to be applied is whether, viewing the evidence in the light most favorable to the government, the jury could find the defendant guilty beyond a reasonable doubt. *See* United States v. Chaney, 446 F.2d 571 (3d Cir. 1971); United States v. Giuliano, 263 F.2d 582 (3d Cir. 1959); United States v. Allard, 240 F.2d 840 (3d Cir.), cert. denied, Fisherman v. United States, 353 U.S. 939, 77 S.Ct. 814, 1 L.Ed.2d 761 (1957); United States v. Kemble, 197 F.2d 316 (3d Cir. 1952). In addition, circumstantial evidence, with

the inferences drawn therefrom, may support a verdict of guilty, and such proof need not exclude every reasonable hypothesis other than that of guilt. *See* Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Carter, 311 F.2d 934, 940 (6th Cir.), cert. denied, Felice v. United States, 373 U.S. 915, 83 S.Ct. 1301, 10 L.Ed.2d 415 (1963).

■ We have examined the notes of testimony carefully. Judged by the above standards, we conclude that the evidence, taken in a light most favorable to the government, could lead a jury to find the defendants guilty of the crimes charged beyond a reasonable doubt.

Because of the nature of the government's case, there is no single piece of evidence which defeats defendants' motions; our conclusion is, therefore, based upon the testimony as a whole. Some of the more significant aspects of the testimony upon which our conclusion is based are as follows:

*First:* Lanni was aware from the start that D'Agata National was making payments to Maiale in return for which she performed no services whatsoever. When Lanni suggested to D'Agata that D'Agata and his brother should raise their weekly salaries by $50, this resulted in an increase in Maiale's salary as well from $150 to $200 a week.

*Second:* McDevitt's testimony discloses that, at the time the payments began, Lanni demanded that Schmidt's discontinue using a motor freight carrier with whose services it was satisfied and use D'Agata National for its Wilmington overflow hauling, to which demand Schmidt's acceded.

*Third:* As Tomlinson's testimony disclosed, Lanni manifested an extraordi-

F.2d 205 (2d Cir.), cert. denied, 362 U.S. 963, 80 S.Ct. 879, 4 L.Ed.2d 877 (1960); Kramer v. United States, 147 F.2d 202 (9th Cir. 1945)], we believe that inconsistent verdicts as to Lanni would be inappropriate in this case. The battleground in the case is over "receipt". There was no evidence of direct payment to Lanni.

Maiale was not a labor leader and was not charged with the substantive offense. Since a conspiracy was therefore necessary to effect "receipt" by Lanni, it is difficult to see, in view of our construction of "receipt", how Lanni could be guilty of conspiracy but not of the substantive offense, or vice-versa.

nary interest in D'Agata National's operation, by visiting D'Agata National every evening, by receiving daily reports from D'Agata's shop steward, by reacting harshly upon finding out that union drivers had damaged D'Agata National equipment, and by attending meetings with D'Agata and Pflaumer which appeared to be beyond the scope of his duties as a union official. These factors tend to show that Lanni had a financial stake in D'Agata National.

*Fourth:* The evidence shows that Maiale refused to accept and D'Agata then stopped sending any more checks after Lanni and D'Agata had a falling out.

*Fifth:* The testimony respecting the shared Miami apartment indicated that Lanni's and Maiale's finances were intertwined. While Lanni signified that he was putting up the equity, Maiale in fact made the down payment with the money received from D'Agata National. And while Lanni told the union membership that the apartment was his, and listed the apartment address on the bill of sale of his boat, title to the apartment was in Maiale's name.

*Sixth:* The testimony of Carl Maier established that, at the same time as the transactions with D'Agata National, Lanni was putting up funds in another corporation under Maiale's name as straw. This shows a pattern of commingling of financial affairs between Maiale and Lanni, which is highly probative on the question as to whether Lanni "accepted or received" funds from D'Agata National within the meaning of the Act as we have construed it. This evidence in this area, taken as a whole, indicates that, even though they were "boyfriend and girlfriend" rather than husband and wife, at the times relevant here much of what nominally belonged to Maiale in reality belonged to Lanni.

When we measure the foregoing facts against the applicable standards on a motion for judgment of acquittal, we find there to have been sufficient evidence for the jury to conclude beyond a reasonable doubt that Maiale received funds from D'Agata National as an agent, intermediary, go-between or front for Lanni, with the contemplation that the monies be made available to or transmitted like a conduit to Lanni, or be held for Lanni's use, and that a conspiracy existed among Lanni, Maiale and D'Agata to violate section 302 of the Labor-Management Relations Act.

## V. DID THE INDICTMENT INSUFFICIENTLY APPRISE THE DEFENDANTS OF THE NATURE OF THE ACTS CHARGED AGAINST THEM AND CREATE A FATAL VARIANCE?

Count 1 of the grand jury's indictment charged Lanni with unlawfully, willfully and knowingly receiving and accepting a sum of money from D'Agata National. As we have previously demonstrated, the government proceeded at trial on a theory of indirect receipt. Defendants, therefore, contend that the government failed to prove the actual receipt of money by Lanni as charged in the indictment, and thus the indictment was faulty because it failed to apprise them sufficiently of the charges against them and created a fatal variance between pleading and proof at trial.

■ It is clear that due process requires that an indictment state the nature and cause of the accusation with the degree of certainty reasonably necessary to enable a defendant to prepare a defense against it and to protect himself against another prosecution on the identical charge. The test is perhaps best formulated in Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932):

> "The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record

shows with accuracy to what extent he may plead a former acquittal or conviction'."

*See also* United States v. Addonizio, 49 F.2d 451 (3d Cir. 1971).

The indictment alleges the receipt of check payments totalling $16,300 together with the following overt acts of conspiracy:

"1. On or about the thirty-first day of March 1967 MARY MAIALE knowingly and willfully received, on behalf of LOUIS LANNI, SR., two thousand one hundred dollars ($2,100) from Joseph D'Agata, which money was the property of the D'Agata National Trucking Company.

2. In or approximately about the month of March 1967, LOUIS LANNI, SR., telephoned an agent of C. Schmidt and Sons, Inc., and caused the said C. Schmidt and Sons, Inc., to discontinue employment of a trucking company then being employed by the said C. Schmidt and Sons, Inc., and to employ instead the D'Agata National Trucking Company.

3. On April 7, 1967, and thereafter on a weekly basis until August 2, 1968, MARY MAIALE knowingly and willfully received on behalf of LOUIS LANNI, SR., a weekly payment of two hundred dollars ($200) from Joseph D'Agata, which money was the property of the D'Agata National Trucking Company.

4. In the month of August 1968, LOUIS LANNI, SR., telephoned or caused an agent of Local 830, International Brotherhood of Teamsters, to telephone, an agent of C. Schmidt and Sons, Inc., and thereby caused the said C. Schmidt and Sons, Inc., to discontinue employment of the D'Agata National Trucking Company.

5. In the month of August 1968, approximately two weeks after the aforementioned employment of the D'Agata National Trucking Company had been discontinued by C. Schmidt and Sons, Inc., as aforesaid LOUIS LANNI, SR., telephoned an agent of C. Schmidt and Sons, Inc., and caused the C. Schmidt and Sons, Inc., to resume employment of D'Agata National Trucking Company, Inc."

Inasmuch as the government's proof focused upon the same $16,300 in checks charged in the indictment, it is our view that the fact that the proof was of indirect, rather than direct, receipts does not create a fatal variance. We think that the defendants were sufficiently apprised by the indictment of the nature of the charges against them to adequately prepare their defense. The cases dealing with section 302 support this view.

In Korholz v. United States, 269 F.2d 897 (10th Cir. 1959), cert. denied, 361 U.S. 929, 80 S.Ct. 367, 4 L.Ed.2d 352 (1960), a jury found an employer and a labor union representative violative of sections 302(a) and (b) respectively. The indictment under which the defendants were prosecuted charged the employer with unlawful payment, and the union president with unlawful receipt and acceptance of money. The defendants appealed, arguing that the indictment created a variance because the proof established that a bank, acting as an agent for both parties, debited the employer's bank account for a certain sum and credited the labor union official's obligation on a debt owed to the bank. In rejecting the defendants' contention that the indictment was faulty because it charged a direct receipt and acceptance of money instead of alleging the series of bank transactions, the court noted:

"The record shows that the bank acted as agent for both parties with their complete approval and the effect of the transaction was not altered by the peculiarities of their arrangement. *The mere failure of the indictment to set forth each step of the transfer of funds does not create a fatal variance.*" *Id.* at 901 (emphasis added).

Similarly, in United States v. McMaster, 343 F.2d 176 (6th Cir.), cert. denied, 382 U.S. 818, 86 S.Ct. 42, 15 L.Ed.

2d 65 (1965), a labor union official was convicted under section 302(b) for receiving payments from an employer of his union members. The proof at trial showed that, rather than making a direct payment to the labor union official, the employer made payments to a corporation which was controlled by the defendant. In affirming the conviction and rejecting defendant's argument that the indictment was faulty since it did not allege that the payments were made through the conduit corporation, the court, citing *Korholz, supra* with approval, held that under the modern rules of pleading defendant was adequately informed of the nature and cause of the accusation.

Defendants rely principally upon the case of United States v. Lippi, 190 F. Supp. 604, aff'd on reargument, 193 F. Supp. 441 (D.Del.1961). In *Lippi*, a labor union official was indicted for receiving money from an employer of employees whom he represented. At trial, however, the government proved that instead of receiving money, the employer had paid the premiums on the defendant's life insurance policies. Since 302(b) makes it illegal to receive money or "other things of value", the court held that the failure of the government to allege in the indictment the receipt of "other things of value" created a fatal variance from the proof at trial. The court reversed the verdict of guilty and ordered a new trial. On rehearing, the government argued that the term "money" should be broadly construed, and that the indictment should not have been considered faulty, since the defendant was apprised of the charges against him and was not at all surprised by the evidence adduced at trial. The court refused to place a broad construction on the term "money", and noted that surprise is not necessary to render a variance fatal:

> "The issue is not whether counsel is in fact surprised but whether there is a substantial possibility, tested from the perspective of the presumption of innocence, that counsel will

be unprepared to meet proof inconsistent with charges contained in the indictment." 193 F.Supp. at 442.

While we believe that the *Lippi* case was rightly decided on its facts, we find its precedent inapplicable to the facts of the instant case. In *Lippi*, the government indicted the defendant for receiving "money", yet it attempted to show the receipt of life insurance premiums, a very different thing. In the instant case, the government charged Lanni with receiving $16,300, and this is exactly what the government proved, albeit on a theory of indirect, rather than direct, receipt. The mere fact that the government did not set forth its entire theory of the case in the indictment, including the means by which Lanni received the money, does not create a fatal variance. As opposed to *Lippi*, we consider the *Korholz* and *McMaster* cases closely on point, and conclude that the indictment was adequate.

## VI. THE ISSUE OF WILLFULNESS

Defendants have alleged as error the failure of the Court to give adequate instructions on the issue of willfulness under section 302(b). In its charge to the jury, the Court gave the following instruction:

> "Now, there is however a further and important element of the offense of violation of the Labor Management Relations Act which must be proved beyond a reasonable doubt. It is willfulness. The Act also requires prove [sic] of willful violation.
>
> Now, an act is done 'willfully' if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law. Intent to disregard the law, that's willfulness.
>
> I'll repeat it: An act is done willfully if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that

is to say, with bad purpose either to disobey or to disregard the law.

Now, intent refers to the state of mind with which the act is done. Criminal intent is a mental element of crime, and is difficult to prove by direct evidence. The existence of such an element may be inferred, however, from acts and conduct. It is impossible, as you know, to look into a defendant's mind or anyone's mind and determine what intention existed at a given time. Intention may be inferred from acts, although each act standing by itself may seem unimportant. This is a question of fact to be determined from all the circumstances.

Now, the indictment also charges that this was done knowingly. An act is done knowingly if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

Therefore, to convict the defendants you must find beyond a reasonable doubt—Well, now, I'm talking—let me repeat that, I'm now talking about Count I: the charge against Mr. Lanni of violating, allegedly violating the Labor-Management Relations Act, in order to convict him you must find beyond a reasonable doubt that he violated Section 186(b) as I have defined it to you, and that the violation was willful." (Charge of the Court, 31–32).

■■■ Defendants have contended that the court erred by failing to give a requested charge that the jury must find the defendants not guilty unless they knew they were violating the law or acted in reckless disregard of the requirements of the law. We deem this contention meritless for two reasons:

*First,* the Court *did* define "willfulness" as the intent to disregard the law. We instructed the jury that willfulness requires "the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law."

*Second,* an examination of the cases addressing this precise issue reveals that our charge was more favorable to the defendants than that to which they were entitled. Although defendants have cited one case which held that a violation of section 302 requires proof of awareness of the law or of a reckless disregard of the law, United States v. Inciso, 292 F.2d 374 (7th Cir.), cert. denied, 368 U.S. 920, 82 S.Ct. 241, 7 L.Ed.2d 135 (1961), the other courts which have confronted this issue on appeal have held that section 302 is *malum prohibitum* and that willfulness only requires that the employee representative receive money with knowledge (1) that he was receiving or accepting money, and (2) that the person who was giving the money was an employer of employees that he represented. Both the Second Circuit, United States v. Ricciardi, 357 F.2d 91, 100 (2d Cir.), cert. denied, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 540 (1966), and the Tenth Circuit, Korholz v. United States, *supra,* 269 F.2d at 903, have rejected union representatives' arguments that willfulness required an awareness of the statute being violated. And see generally United States v. Ryan, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956), where the court, in enunciating the view that section 302 was a broad prohibition against bribery in the field of labor-management relations, held that the statute was *malum prohibitum.* We believe the *Ricciardi* and *Korholz* view to be the proper one, and, although the Third Circuit has never addressed this issue, we believe that it would adopt the views expressed in those cases.

## VII. THE COURT'S INSTRUCTION AS TO THE RELATIONSHIP OF THE CO-DEFENDANTS

■■■ Defendants have argued strenuously in their motion that the jury convicted them, not upon the evidence presented by the government, but because of their personal relationship and consequent moral turpitude, *i. e.,* despite the fact that Lanni is married, they were

boyfriend and girlfriend and shared an apartment in Florida. They argue, therefore, that the Court should have specifically instructed the jury that it was not to consider the moral propriety of the defendants' relationship in determining guilt or innocence. Defendants requested the following instruction:

"You should consider the relationship between defendants, Lanni and Maiale, if at all, only as it relates to the charges in this indictment. The moral propriety of their attending a convention together or sharing an apartment is not an issue in this case."

Although this request was refused, we twice gave the jury the following charge, emphasizing the words "associated with each other":

"Mere similarity of conduct among various persons, and the fact that they may be associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy."

Upon reflection, we conclude that we were correct in refusing defendants' suggested instruction. Our charge explained the law in a neutral way, whereas the defendant's requested charge might have given the jury the inference that the Court favored the defendants' position. We believe that the jury was fully instructed on the law and the requirement of finding guilt beyond a reasonable doubt, and we do not believe it can be said that the jury convicted the defendants on the ground of moral turpitude.

## VIII. THE CO-CONSPIRATOR RULE

During the course of the trial, Francis J. Tomlinson testified as to conversations he overheard at the union hall between Lanni and D'Agata National's shop steward, Tony D'Roso and between Lanni and his chauffeur. All of these conversations were held out of Maiale's presence. Defendants contend that Lanni's instructions to his chauffeur to drive him to D'Agata's to "pick up some tin", out of Maiale's presence, required an immediate limiting instruction to the effect that the jury should disregard the statement as far as Maiale was concerned unless, and until, the jury found the existence of a conspiracy independently of those statements, and that the Court's failure to give a limiting instruction at that time constitutes reversible error.

We have carefully reviewed the notes of testimony, and in so doing fail to find any request for such limiting instructions at the time of Tomlinson's testimony (although we do find such a request at the end of the trial). Moreover, in our charge to the jury, we *did* instruct them as to the use of Lanni's statements outside of Maiale's presence:

"Now, during the trial, the statements of persons alleged by the Government to be co-conspirators—in this case I refer to Mr. Lanni and Miss Maiale—were received in evidence. Now, by that I mean Mr. Tomlinson and others testified as to what Mr. Lanni or Miss Maiale said. That's what I mean when I say that statements of persons alleged by the Government to be co-conspirators were received in evidence.

Now, I instruct you to consider those specific statements only against the defendants who were present, unless and until you find that a conspiracy did in fact exist, independently of those statements.

I now instruct you that you may consider a statement made by one defendant, not in the presence of the others, admissible only against the one making the statements.

I will repeat: In determining whether or not a defendant or any other person was a member of a conspiracy, you are not to consider what others may have said or done. That is to say, the membership of a defendant, or any other person, in a conspiracy, must be established by the

evidence in the case as to his own conduct, what he himself willfully said or did.

During the trial, the statements of persons alleged by the Government, to be co-conspirators, Mr. Lanni and Miss Maiale, were received in evidence.

And I instruct you to consider those specific statements only against the defendants who were present, unless until you find that a conspiracy did in fact exist, independently of those statements.

I now instruct you that you may consider a statement made by one defendant, not in the presence of the others, admissible only against the one making the statement.

In other words, whenever it appears beyond a reasonable doubt from the other evidence in the case that a conspiracy existed, and that a defendant was one of the members, then the statements thereafter knowingly made and the acts thereafter knowingly done, by the person likewise found to be a member may be considered by you as evidence in the case as to the defendant found to have been a member, even though the statements and acts may have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy, and in furtherance of some object or purpose of the conspiracy.

Otherwise, any admission or incriminatory statement made or act done outside of the court by Mr. Lanni or Miss Maiale may not be considered as evidence against anyone who was not present and heard the statement made, or saw the act done; by which I mean that otherwise any statement made outside of the court by one defendant may not be considered as evidence against another defendant not a party to such statement."

In support of their contention that our failure to give a limiting instruction to the jury at the time of Tomlinson's testimony was error, defendants cite the case of United States v. McMaster, *supra*. In *McMaster*, a trucking company president and a Teamster's Union official were found guilty of violating sections 302(a) and 302(b) respectively, where the evidence established that the company president made payments of money to a corporation which was effectively owned and controlled by the union official. On appeal, one of the grounds alleged as error by the labor union official was the introduction at the joint trial of statements made by the corporate president—co-defendant to an FBI agent. The labor union official claimed that it was error for the statement of the co-defendant to have been admitted against him in the absence of a prompt warning by the trial judge to the jury to disregard the co-defendant's statement completely as far as the labor union official was concerned. Such a prompt warning was requested by counsel but was not given. However, the judge gave an admonition of this nature in his charge. The appellate court agreed that the delay in giving the admonition to the jury to disregard the evidence was error, but held that other evidence of McMaster's willful violation was so overwhelming that the admission of the co-defendant's testimony was harmless error, and thus not cause for reversal.

With respect to the present case, it is our view that: (1) there was no error because there was no request for instruction at the time of the statements now objected to; and (2) if there was any error, it was (a) cured by the emphatic instruction on the charge, or (b) rendered harmless by the other evidence in the case. In addition to these points, we find the *McMaster* case to be distinguishable from this case. *McMaster* and his co-defendant were charged with the substantive violations under section 302, not as conspirators, and it is clear that in the absence of a conspiracy or an agency, a co-defendant's statements are never admissible

against the other. Indeed, the *McMaster* court noted that:

> "[T]his was not a conspiracy case. Wolff [the co-defendant] was not an agent of McMaster and the statement (admissible as to Wolff) was not admissible as to McMaster." *Id.*, 343 F.2d at 182.

Where the co-defendants are charged with a conspiracy, the evidentiary rules vary, and it is clear that an admission of a co-conspirator may be used against the other once the operative facts of the conspiracy, independent of the admission, are established. *See* United States v. Boyance, 329 F.2d 372 (3rd Cir.), cert. denied, Feldman v. United States, 377 U.S. 965, 84 S.Ct. 1645, 12 L.Ed.2d 736 (1964); 4 Wigmore, Evidence §§ 1076, 1079 (3d ed. 1940). In view of the foregoing, we hold that no error occurred in our failure to give a limiting instruction at the time of Tomlinson's testimony.

## IX. TESTIMONY OF CARL MAIER

Over the objection of counsel for defendants, but subject to a limiting instruction to the jury, the testimony of Carl Maier was received into evidence.

As previously noted, Maier testified about transactions involving the formation of a leasing company in which Lanni was to be a one-third shareholder but in which his stock would be nominally held by Maiale as a "straw party." This evidence was, of course damaging to the defendants because it tended to show that there was a pattern of conduct whereby Maiale acted on Lanni's behalf and that what belonged nominally to her, in reality, belonged to him. In our charge to the jury, we stated:

> "However, there are some special instructions that I must give you with respect to the testimony of Carl Maier, the last witness. You will recall that Mr. Maier was the Government's last witness. He testified to certain meetings and conversations with Miss Maiale and Mr. Lanni, and certain transactions pertaining to the formation of two corporations—an automotive maintenance company and a real estate company—in which Miss Maiale was issued stock.
>
> Now, I instruct you that whatever your opinion may be as to the nature or propriety or import of the subject matter of those meetings and transactions, they have no bearing whatever upon this case. Whatever your opinion may be as to the nature or propriety or import of the subject matter of those meetings or transactions, they have no bearing whatever upon this case; and you are not to consider them in connection with the case or draw any inferences from those transactions to this case.
>
> The testimony of Mr. Maier is relevant to this case only for a very limited purpose; that is, because it concerns the relationship between Mr. Lanni and Miss Maiale in a financial matter. It is possible and permissible for you to infer that what happened in the matters about which Mr. Maier testified indicates some pattern or custom of relations in financial matters between Miss Maiale and Mr. Lanni. It is also possible and permissible for you to infer that the transactions which Mr. Maier testified about were isolated transactions or were totally different in their nature or scope or import from the matters involved in this case. You may draw either inference. It is for you to determine which to draw." (Charge of the Court 44–45).

Defendants objected to the introduction of the Maier testimony on the ground that it was irrelevant. We disagree. The test of relevancy of evidence is whether the conclusion sought to be established is a probable inference from the offered facts. *See, e. g.,* Holt v. United States, 342 F.2d 163 (5th Cir. 1965); Guthrie v. United States, 92 U.S.App.D.C. 361, 207 F.2d 19 (1953). Viewed by this standard, we believe the evidence relevant (*i. e.,* it had probative value) in permitting an inference that

Maiale was acting as a "straw party" when she received the checks from D'Agata National, just as she was in the transaction about which Maier testified, and we limited consideration of the evidence to that question.

Our ruling would have been no different had Maier's testimony amounted to evidence of a criminal act, because the caselaw is clear that evidence regarding crimes or transactions not charged in the indictment are admissible for the purpose of showing a plan, motive, scheme or design to commit the offenses charged, or that the defendants have acted with similar intent or in a similar manner in the past. *See, e. g.*, Stratton v. United States, 387 F.2d 364 (10th Cir. 1968); United States v. Bradley, 152 F.2d 425 (3d Cir. 1945).

## X. PROMPTNESS IN ANSWERING THE JURY'S QUESTION

[16] The jury began its deliberations on the morning of February 26, 1971, immediately following the Court's charge. While the jury was on its luncheon recess, the Court attended a Federal Bar Association luncheon. At 2:00 p. m., while in the process of leaving the luncheon, the Court received a telephone call to the effect that the jury had a question for the Court. After instructing the deputy clerk that counsel be summoned, the Court hastened back to chambers, arriving at approximately 2:15 p. m. Counsel arrived in the Court's chambers within a few minutes and a conference then commenced. The foreman of the jury had written out in longhand two questions which read as follows:

1. "If Lanni was at the meeting, when they first set up the corporation".

2. "Board of Directors meeting, in Goldman's office—was Lanni present at this meeting (Mr. Burke's) [sic] testimony".

Since daily copy of the transcript was available, the Court and counsel undertook a hurried examination of the notes of testimony to ascertain if the transcript would answer the jury's questions with any degree of clarity. Because of the necessity of searching out various portions of the testimony, a period of some five or ten minutes was thus consumed. Because of the importance of the case, and the fact that the trial had taken two weeks, the Court thereupon heard extensive oral argument from counsel as to whether the Court should answer the jury's questions, and, if so, how.[14] At 2:45 p. m., the Court went on the record and informed counsel that, notwithstanding the fact that there was daily copy, it would not answer the jury's questions, but would inform the jury that, since the questions related to matters of evidence and not matters of law, it was the jury's recollection that controlled. The Court, of course, had instructed the jury at length during the course of its charge as to the role of the jury as the trier of matters of fact.

In the case of United States v. Rabb, 450 F.2d 343 (3d Cir., filed Oct. 19, 1971), the United States Court of Appeals for the Third Circuit observed:

"We think it undesirable for a trial judge to engage in discussions with individual jurors about particular evidence even though the discussions result from a request by the jury to speak to the court. * * *"

An analysis of the jury's questions confirms the wisdom of this observation and the correctness of the Court's decision not to engage in discourse with the jury about the matter. The jury's first question was actually unintelligible, since it does not appear from the question what corporation the jury was referring to, necessitating colloquy to provide an answer. With respect to the second question, it appeared upon review of Mr. Berk's testimony that it did not reflect whether Lanni was or was not present

14. The argument was off the record.

at the directors' meeting. An answer to the jury's question, if possible, would therefore have required the reading of a great deal of testimony, which might have confused the issue and emphasized one portion of the testimony over others. Moreover, an exegesis of the relevant testimony by the Court would have inevitably amounted to a characterization of the testimony. Despite objection of defense counsel, the Court indicated that the only basis on which it would answer the jury's questions would be if counsel could agree upon a formulation, which they could not.

After the Court had placed its refusal to answer the jury's questions and the grounds therefor on the record, the Court and counsel started on their way to the courtroom so that the Court could notify the jury of its decision. At that moment the deputy clerk arrived to advise the Court that the marshal had informed him that the jury had reached a verdict. The time was 2:55 p. m., fifty-five minutes after the Court had been informed of the jury's questions. The jury was thereupon placed in the jury box, and the forelady announced the verdict of guilty on all counts. The jury was then polled, following which we accepted the verdicts and recorded them.

Defendants now allege as error our failure to promptly answer the jury's questions. They readily admit that the giving of additional instructions to a jury, after it has begun its deliberations, rests within the sound discretion of the trial judge. They contend, however, that the issue is not whether or not the instruction should have been given, but rather, whether it was prejudicial error for the Court to "ignore" the request for the time period just mentioned, despite the Court's awareness that the jury was "confused over some matter and was awaiting reply to the question." Counsel argues that not to promptly instruct the jurors, even if only to tell them that the Court would not answer their questions, and then to accept a guilty verdict was prejudicial error. We disagree. We have not been given, and have not found

any cases to support defendants' position. However, we have found two cases supporting the government's position that the delay in informing the jury that its questions could not be answered did not constitute error.

The first case is Jordon v. Bondy, 72 App.D.C. 360, 114 F.2d 599 (1940). In Jordon, defendant contended that his constitutional rights were prejudiced by the failure of the trial judge to be available to the jury during its deliberations, thereby depriving it of the benefit of further instructions which one or some of them demanded. In that case, the jury began its deliberations about noon on Thursday. Late Thursday evening, when the judge had returned to his home, a juror made a request for additional instructions. The request was communicated through the foreman to the deputy marshal, who sought the judge in his chambers but returned and reported that the judge had gone home, that they could send for the judge, but it was late to do so. Without sending for the judge, the jury continued its deliberations that evening, retired for the night, resumed deliberations the following morning, and then reached a verdict shortly before noon. Although the judge was available that morning, there was nothing to show that the request for further instructions was repeated. When the verdict was returned, each juror was polled, including the juror who had originally asked for additional instructions. The appellate court, in rejecting defendant's contention that the court erred in not answering the jury's question before accepting a verdict, concluded that the juror who sought the additional instructions must have changed his mind and thus assented to the verdict.

In this case, we do not know how many jurors sought the additional instruction, but it is clear that the jury continued deliberating while the Court was in chambers conferring with counsel and a short time later the jury reached a verdict. In this case, as in Jordon, each juror was polled and assented to the guilty verdict. Therefore, we can only

conclude that the juror or jurors who sought additional instructions changed their mind about the need for instructions and were able to reach a guilty verdict through further deliberations.

The second case in support of the government's position is a recent Pennsylvania Supreme Court case, Commonwealth v. Milliner, 442 Pa. 537, 276 A.2d 520 (1971). The relevant facts are succinctly set forth in Justice O'Brien's opinion as follows:

"Appellant was tried before a judge and jury on December 12–17, 1968, on a charge of rape. On December 17, at approximately 3:30 p. m., four and one-half hours after the jury had begun its deliberations, the court crier told the judge the following: At approximately 2:00 p. m., he had been asked by the jury foreman whether the appellant had made a statement at the time he was arrested and had replied 'I don't know and even if I did I couldn't tell you.' He then asked the foreman if the jury wanted further instructions and was told they did not. However, approximately an hour and one-half later the foreman again asked him whether the appellant had made a statement. The court crier told him that he could not answer the question and asked 'Do you have a problem?' This time the jurors indicated that they did, which was why the court crier came to the judge with the jury's request for a meeting at which they could seek further instructions.

The trial judge and the two attorneys then met to discuss how the court should handle the forthcoming jury's request for instructions. The appellant's counsel stated that it was his opinion that the jury was considering matters not in evidence, and in particular a nonexistent confession by the appellant. He urged that the court not confine itself to instructing the jury that there was no evidence of any statement before them, but that it elaborate to make it clear that no statement existed. During this discussion, appellant's counsel indicated a fear that the jury might be reacting to extensive coverage in the news media concerning the Paul Ware case where the district attorney requested the court to nolle pros. four murder charges against a defendant because his confessions were invalid under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)." Id. at 438, 276 A.2d at 521–522.

Between twenty minutes and a half hour after the court and the attorneys began their discussions, and before the jury had been returned to the courtroom to make its request to the judge for additional instructions, the jury reported that it had agreed upon a verdict. The court received the jury's verdict and, after polling the jury, recorded it. At a post trial hearing, the court crier was called to testify and he corroborated what he had told the judge on the day of the jury's deliberations. The court thereupon denied defendant's motion that the jurors be questioned as to their deliberations.

The question on appeal was formulated in terms of whether the trial court had erred in denying appellants' request for a hearing to determine whether the jury considered facts not in evidence in reaching its verdict. While the grounds for affirmance were that the court crier's testimony was credible, that his response was correct and not harmful to the defendant, and that defendant's counsel had made no objection when informed of the conversation and did not request that the jurors be questioned at the time, we believe that the result in Milliner, when measured against its facts, support our view that there was no error in this case because of the delay (for a much shorter time than in Milliner) in informing the jury that the court would not answer its questions about what the evidence was. Moreover, we believe that to conclude that the jury in this case reached a different verdict because we did not answer its questions than it would have had we informed it

that we could not answer them, is to indulge in gossamer speculation.

Certainty in the resolution of issues of fact is rare if not non-existent. The resolution of differences and uncertainties is at the heart of the jury process. It is our view that a jury's assent to a guilty verdict can mean only that the jury, through further deliberation, was able to resolve any uncertainty which pervaded its deliberations, thereby reaching agreement. We find no prejudice in the delay, and conclude that there was no error in the Court's failure to promptly inform the jury that it could not answer its questions.

### XI. CONCLUSION

Our reading of section 302, in light of its legislative history, persuades us that our charge to the jury was proper. Our examination of the record persuades us that there was sufficient evidence to sustain the verdicts of guilty and that there were no errors to warrant the granting of a new trial.