**UNITED STATES of America,**
**Appellee,**

**v.**

**Joseph P. PFINGST, Appellant.**

**No. 424, Docket 72–1998.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 23, 1973.

Decided April 4, 1973.

Certiorari Denied June 11, 1973.
See 93 S.Ct. 2779.

Joseph J. Marcheso, New York City (Philip M. Kazin, Morton J. Schlossberg, and Walter I. Nathan, New York City, of counsel), for appellant.

Joseph W. Ryan, Jr., Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., for E. D. New York, L. Kevin Sheridan, Asst. U. S. Atty., and David G. Trager, Sp. Asst. U. S. Atty., of counsel), for appellee.

Before MOORE, HAYS and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Following a four week trial before a jury and Judge Weinstein in the Eastern District of New York, appellant, Joseph P. Pfingst, who had served as a New York State Supreme Court Justice, was convicted on three of the nine substantive counts of a ten-count indictment. The indictment alleged that, while appellant was a practicing lawyer, he transferred and concealed corporate assets in contemplation of bankruptcy in violation of 18 U.S.C. § 152 and engaged in a conspiracy to do the same, 18 U.S.C. § 371. On each count he was sentenced to three years' imprisonment but with execution suspended as to all but four months, the sentences to run concurrently. On this appeal, Pfingst does not challenge the sufficiency of the evidence against him. Rather, he launches a multifaceted attack on the conduct of his trial, both by the prosecutor and trial judge. While appellant's contentions have in many cases a verisimilitude, upon close scrutiny in the light of the record none of them warrants reversal of his conviction. We therefore affirm.

I. Background.

To understand the reasons we reject appellant's contentions of error requires a somewhat detailed exposition of the evidence. In 1965, when the case begins to unfold, the Evans Dairy business consisted of a group of corporations whose stock was closely held by the Evans family. There were six related corporations dealing with all the different phases of milk production and sale: a company which operated a receiving plan, Chenango Farm Products, Inc. ("Chenango"); a purchasing company which also operated an additional milk receiving plant, W. M. Evans Dairy, Inc. ("W. M. Evans"); a processing and distributing company, Evans Amityville Dairy, Inc. ("Evans Amityville"); two companies which sold directly to retail customers, Woodside Farms, Inc. ("Woodside"), and Half Hollow Farms, Inc. ("Half Hollow"); and a real estate holding corporation that owned the property used by the processing and distributing company, Highground Realty Corporation ("Highground"). The two principal

components of the business were W. M. Evans and Evans Amityville.

In 1965 one Ramon N. D'Onofrio, who pleaded guilty to charges similar to those brought against appellant[1] and who was the principal witness against appellant at trial, had been a salesman for and ultimately became a vice president of Evans Amityville. Early in that year D'Onofrio learned that the Evans dairy business was for sale. He was encouraged and advised by Pfingst, at that time a practicing attorney and personal friend, to purchase the business. D'Onofrio, however, could not obtain the necessary credit on his own. By virtue of associating with one Sam Marcus, an experienced and respected dairy man whose credit was excellent, D'Onofrio was able eventually to acquire the Evans dairy business jointly with Marcus from the Evans family, largely for some long-term notes. Pfingst became the lawyer for the purchasing interest in connection with the negotiations that ensued. Upon completion of the purchase, Pfingst became a director of all the corporations, secretary of all of them except Evans Amityville, a minority stockholder of Evans Amityville and Half Hollow, and general counsel to the dairy business. There was evidence, centering around Pfingst's demand for $50,000 legal fees conpensating his work for the purchase, that Pfingst was aware as early as August, 1965, of the poor financial condition of the Evans dairy business. After Marcus and his son discovered that D'Onofrio had drawn checks payable to Pfingst in the sum of $26,500 from Woodside and $20,000 from Evans Amityville, Pfingst kept $10,000 and took a $30,982 mortgage owned by Highground and a $7,500 note from Evans Amityville.

In October, 1965, Sam Marcus died and plans for the rehabilitation of the Evans business accordingly suffered a severe blow. D'Onofrio, who lacked financial resources and managerial experience, could not carry on alone. As a buyer could not be found, D'Onofrio and Pfingst decided to acquire the interest of the Marcus estate in the business and, as the jury could infer, to milk whatever profit could be made before the business went bankrupt. They became, according to D'Onofrio's testimony and corroborating evidence,[2] 75%–25% partners, acquired the interests of the Marcus estate on February 28, 1966, and refinanced some of the debt of the business by factoring accounts receivable. There was evidence from which it could be inferred that the Evans dairy business was already bankrupt at the time that it was acquired by the D'Onofrio-Pfingst partnership. In April, 1966, milk suppliers refused to extend further credit and total collapse could no longer be avoided. An assignment for the benefit of Evans Amityville creditors was made in state court that same month. Later in the year W. M. Evans and Evans Amityville were adjudicated involuntary bankrupts.

The Government's case was that Pfingst and D'Onofrio, knowing bankruptcy to be both inevitable and imminent, fraudulently moved to skim the

---

1. D'Onofrio was sentenced to three years' imprisonment, execution suspended, he was placed on probation for two years and fined $10,000. Another co-defendant, James W. Feeney, was granted a severance during trial and, after Pfingst's acquittal on the three counts naming Feeney, had his case dismissed, on the Government's motion.

2. When the closing took place 270 shares of Woodside were issued, 202½ or 75% to D'Onofrio, and 67½ or 25% to Pfingst, the stubs in the latter's handwriting. So too, the rights of Marcus to a $100,000 certificate of deposit were assigned $75,000 to D'Onofrio and $25,000 to Pfingst. On March 21, 1966, $100,000 of W. M. Evans funds were issued to the two on the same basis; on March 22 $10,600 more were. There were attempted transfers of a smaller amount from the Chenango and Highground accounts on substantially the same basis. While the evidence was unclear, and hotly disputed, the W. M. Evans stock book lent some substantiation, by no means conclusive, however, to the 75%–25% arrangement.

cream of the assets of the Evans dairy business for their personal benefit. Two of the steps they took in this regard formed the basis for Pfingst's conviction. The first began on March 15, 1966, when a substantial portion of the major Evans Amityville asset, its wholesale customer business, and the Chenango milk receiving plant were sold to a competitive dairy for $229,000. Fifty thousand dollars of this amount was held by Pfingst in escrow pending completion of certain provisions in the sales contract which he had prepared. The remaining $179,000 was deposited in the Evans Amityville bank account. Three days later $160,000 was transferred from the Evans Amityville account to the W. M. Evans account. Subsequently, on March 21, 1966, a check payable to D'Onofrio for $75,000 and a check payable to Pfingst for $25,000, both marked "for Purchase of Stock," were drawn on the W. M. Evans account. These checks were not drawn according to the usual corporate procedure nor was a purchase of D'Onofrio's or Pfingst's stock by W. M. Evans authorized by corporate resolution. Furthermore, W. M. Evans was in precarious financial position at the time and could ill afford the expenditure. While Pfingst contended that the $25,000 check to him represented payment for legal fees, D'Onofrio testified that the notation "for Purchase of Stock," was pursuant to a scheme devised by Pfingst to make the transfer look like a bona fide stock transfer. The jury convicted Pfingst of fraudulently transferring the $25,000 to himself, although it acquitted him of fraudulently participating in the $75,000 transfer to D'Onofrio.

The other transfer which formed the basis of the counts on which Pfingst was convicted concerns two other checks drawn on the W. M. Evans account and paid for out of the proceeds of the March 15, 1966, sale of the dairy business's assets described above. These checks were for the aggregate amount of $10,600, with $7,950 (or 75 per cent) going to D'Onofrio and $2,650 (or 25 per cent) going to Pfingst.[3] The money, according to D'Onofrio's testimony, was to finance a joint venture in a Puerto Rican dairy unrelated to the Evans business, and an accountant corroborated him by his testimony · that D'Onofrio and Pfingst wanted him to accompany them to Puerto Rico to look over some dairy books in connection with a "possible purchase." The checks were marked "Dividend, Woodside Farms," but there was evidence that payment of a Woodside Farms dividend by W. M. Evans was "irregular" and unsubstantiated by corporate resolution, and that W. M. Evans needed the cash used for the "dividend" to pay its debts.[4] The defense did not offer any explanation for this transfer and the jury found Pfingst guilty of fraudulently arranging it for his own and D'Onofrio's benefit.

It is to be noted that on all charges D'Onofrio's testimony was a considerable portion of the prosecution's case against Pfingst. D'Onofrio was involved in many other dealings that were shady, to say the least, and his credibility was a critical issue at trial. Indeed, on the charges of which Pfingst was acquitted the evidence was limited to D'Onofrio's testimony, while on the charges of which Pfingst was convicted, in contrast, documentary evidence and the testimony of other witnesses corroborated D'Onofrio's version of events.

It is important, however, to describe in some detail the unrelated bribery charge brought against appellant in the Eastern District, for it is involved in some of his contentions here. Some nine months after the indictments in the

---

3. *See* note 2 *supra.*

4. There was also testimony from D'Onofrio that Pfingst told him that to draw money out of the Woodside account would impair its current asset ratio to a point below the 3–2 level required by the original agreement between D'Onofrio and Pfingst with the survivors of the Evans family.

bankruptcy case a grand jury indicted him for the crime of having paid one Frederick R. Fellman, the Babylon, Long Island, town Republican leader, $50,000 in cash in return for that party's nomination in 1968 for the judgeship. The bribery indictment charged that, *inter alia*, Pfingst traveled and caused D'Onofrio to travel to Switzerland to arrange for the bribe money in violation of 18 U.S.C. § 1952. Fellman, but not D'Onofrio, was indicted for participation in the bribery scheme. Fellman pleaded guilty but Pfingst went to trial.

The bribery trial began one month after the verdict in the bankruptcy case, lasted five weeks, and was also presided over by Judge Weinstein. During its course D'Onofrio refused to permit the Government or the defense access to his (and supposedly Pfingst's) Swiss name bank account, "Gypsy." Rejecting D'Onofrio's claim of self-incrimination on this point Judge Weinstein held him in contempt for the duration of the trial. D'Onofrio was thus discredited in front of the jury, and the Government was deprived of D'Onofrio's further testimony. The jury acquitted Pfingst on the bribery charges. Judge Weinstein, however, denied Pfingst's motion for a new bankruptcy trial based upon the bribery acquittal, holding that the bribery acquittal did not make D'Onofrio's testimony in the bankruptcy case incredible as a matter of law.

II. Contentions of Prosecutorial Misconduct.

Perhaps the most vigorously pressed of appellant's contentions of error in this case is that individually and cumulatively various instances of prosecutorial misconduct deprived him of a fair trial. We shall treat each instance of alleged misconduct separately and then consider their alleged cumulative impact.

A. *Pre-trial publicity.* Appellant complains that the United States Attorney (with the Suffolk County District Attorney) held a televised press conference to announce the "much more sensa-tional" bribery indictment on the eve of the bankruptcy trial and this resulted in prejudice to his rights. His complaint has two components: first, that the prosecutor deliberately manipulated the timing of the bribery indictment and that the remedy for this misconduct is to award appellant a new trial; and second, that the publicity attendant upon the announcement of the bribery indictment created an atmosphere in the community which made a fair trial for appellant impossible.

■ The charge of deliberate manipulation of the timing of the bribery indictment is not supported by the record. Although D'Onofrio told the FBI about the bribery plan in January, 1971, before the bankruptcy indictment was filed on February 8, 1971, indictment on the bribery count was delayed until September 1, 1971, when the Government had the evidence of actual payment of the bribe supplied by Fellman's confession of August 4, 1971. Once Fellman confessed, the Government decided to press forward with the bribery case because it was far simpler and the supporting evidence was thought to be stronger than on the bankruptcy fraud charge. Both Judge Bartels and Judge Rosling, who each presided over aspects of the pre-trial maneuvering in both cases, agreed with the Government's contention that the bribery case should be tried first. Judge Weinstein, to whom both cases were eventually assigned, was of a similar view, but nonetheless acceded to the *defense* request that the bankruptcy case be tried first. The announcement of the bribery indictment was made in early September, 1971, and while the trial date for the bankruptcy case had been set in June tentatively for October 15, 1971, it was not actually tried until March of 1972. The timing of the bribery indictment was obviously related to Fellman's confession and cannot support an inference of deliberate prosecutorial misconduct in connection with the bankruptcy case when the latter's trial date was set for six weeks later and then set only tentatively.

The form of the public announcement of the bribery indictment, however, raises more troublesome questions. The announcement emphasized the allegations that the bribe money had been withdrawn from a Swiss bank account and that this was the first federal indictment of a state Supreme Court justice. The Government properly argues that the presence of the Suffolk County District Attorney was justified as evincing state and federal law enforcement cooperation on a matter of joint interest. While the information about the Swiss bank account was a matter of public record and the unprecedented nature of the indictment is not disputed, it is contended that the press conference violated the spirit, if not the letter, of Rule 8 of the Criminal Rules of the Eastern District of New York.[5] These circumstances and remarks do seem too much designed for dramatic effect and to call attention to the prosecutors rather than for public information and enlightenment about the administration of justice in Suffolk County. Judge Bartels, indeed, took the Govern-

5. Rule 8, which tracks the ABA approved Standards Relating to Fair Trial and Free Press § 1.1 (1968), provides in pertinent part:

1. It is the duty of the lawyer *or law firm* not to release or authorize the release of information or opinion *which a reasonable person would expect to be disseminated by* means of public communication, in connection with pending or imminent criminal litigation with which he or the firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise *prejudice the due administration of justice.*

. . . . .

3. From the time of arrest, issuance of an arrest warrant, or the filing of a complaint, information or indictment in any criminal matter until the commencement of trial or disposition without trial, a lawyer *or law firm* associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement *which a reasonable person would expect to be disseminated by* means of public communication, relating to that matter and concerning:

(1) The prior criminal record (including arrests, indictments, or other charges of crime), or the character or reputation of the accused, except that the lawyer *or law firm* may make a factual statement of the accused's name, age, residence, occupation, and family status, and if the accused has not been apprehended, a lawyer associated with the prosecution may release any information necessary to aid in his apprehension or to warn the public of any dangers he may present;

(2) The existence or contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement;

(3) The performance of any examinations or tests or the accused's refusal or failure to submit to an examination or test;

(4) The identity, testimony, or credibility of prospective witnesses, except that the lawyer *or law firm* may annuonce [sic] the identity of the victim if the announcement is not otherwise prohibited by law;

(5) The possibility of a plea of guilty to the offense charged or a lesser offense;

(6) Any opinion as to the accused's guilty [sic] or innocence or as to the merits of the case or the evidence in the case.

The foregoing shall not be construed to preclude the lawyer *or law firm* during this period, in the proper discharge of his *or its* official or professional obligations, from announcing the fact and circumstances of arrest (including time and place of arrest, resistance, pursuit, and use of weapons), the identity of the investigating and arresting officer or agency, and the length of the investigation; from making an announcement, *at the time of seizure of any* physical evidence other than a confession, admission ar [sic] statement, which is limited to a description of the evidence seized; from disclosing the nature, substance, or text of the charge, including a brief description of the offense charged; from quoting or referring without comment to public records of the court in the case; from announcing the scheduling or result of any stage in the judicial process; from requesting assistance in obtaining evidence; or from announcing without further comment that the accused denies the charges made against him. [Emphasis original.]

ment correctly to task for its conduct during this phase of the proceedings. The press conference did not, however, create the kind of "carnival atmosphere" resulting from pretrial publicity that requires a new trial under the sixth amendment and the due process clause. Sheppard v. Maxwell, 384 U.S. 333, 358, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); see Estes v. Texas, 381 U.S. 532, 85 S. Ct. 1628, 14 L.Ed.2d 543 (1965); cf. ABA Standards Relating to Fair Trial and Free Press 27–40 (1968). The press conference occurred some six months before the jury in the bankruptcy trial was drawn; the memory of the public for such news is short. The degree of pre-trial publicity in this case is minor compared to the kind of on-going, never-ending sensationalist publicity which infected the trial in Sheppard, or in the other cases where reversal has been warranted. Appellant never moved for a change of venue. Furthermore, unlike Sheppard, the trial judge here "fulfill[ed] his duty to protect [the defendant] . . . from inherently prejudicial publicity . . . .," 384 U.S. at 363, 86 S.Ct. at 1522, Judge Weinstein scrupulously examined the jurors before they were impaneled on questions relating to the possible influence of pre-trial publicity. Only one potential juror was excused on that ground. We are satisfied that appellant's trial was not rendered unfair by this one press conference.

■ B. *Publicity during the trial.* Appellant contends that the Government deliberately arranged for or "had" Fellman plead guilty to the bribery charge on the second day of the bankruptcy trial and that the resulting publicity made the bankruptcy trial constitutionally unacceptable. This contention is baseless. In fact the defense withdrew a charge of deliberate manipulation below, while maintaining that the Government is charged "with knowing the natural consequences of their act . . . ." Rather than being the result of a prosecutorial conspiracy the timing of Fellman's plea and sentencing was ar-

ranged by the trial judge and Fellman's counsel at the pre-trial conference in the bribery case. Appellant's counsel was present and stood silent when the date for the pleading was set. Probably as a result of this silence the trial court apparently thought the sentencing date favorable to appellant. The defense had concurred in the trial court's desire to have D'Onofrio sentenced before the bankruptcy trial began, presumably because the defense wanted the fullest possible ammunition for D'Onofrio's cross-examination. By virtue of defense counsel's silence the trial court may well have thought the defense wanted the same tactical advantage for Fellman's testimony in the forthcoming bribery trial.

Here, too, Judge Weinstein scrupulously protected the trial from being infected with prejudice by any of the publicity surrounding Fellman's plea. Although rejecting appellant's mistrial motion based on it, the judge immediately renewed his stern warnings to the jury against reading, seeing or listening to news reports about the trial. He examined each individual juror on this subject, and found that none had violated his instructions. Thereafter, he opened court each day by asking the jurors collectively and individually whether they had been exposed to publicity about the case. He closed each court day with a stern warning to the jury to avoid it. Appellant has made no colorable showing that there was any prejudice from the timing of Fellman's plea, at least in the light of this very careful judicial conduct.

C. *The prosecutorial "demand."* A central issue at trial was whether Pfingst and D'Onofrio in fact established a partnership to take over the Evans dairy business or whether, as the defense contended, Pfingst merely acted as a lawyer representing D'Onofrio's interests. To prove that Pfingst was D'Onofrio's partner on the third day of what was to be a four week trial and during D'Onofrio's direct examination, the Government offered in evidence its

Exhibit 14. This exhibit was a conformed copy of a signed agreement with the estate of Sam Marcus, which released, on various conditions, the interest of that estate in the Evans dairy business to Pfingst and D'Onofrio. One of the recitals in Exhibit 14 states, "D'Onofrio and Pfingst desire to acquire the stock theretofore owned by Sam Marcus in Evans Amityville Dairy, Inc. . . . .," thus clearly indicating that Pfingst and D'Onofrio were in fact partners in acquiring the Evans dairy business.

■ By virtue of discovery proceedings, the marking of the exhibit for identification two weeks before trial, and the understanding that objections to authenticity would be made in letter form, the defense had adequate opportunity to but did not object to the admissibility of Exhibit 14 prior to trial. It did object, however, when Exhibit 14 was offered into evidence, on what the trial court articulated as a "best evidence" ground. To meet this objection the Government sought to lay a foundation for the introduction of the copy by establishing that D'Onofrio returned the original from which Exhibit 14 was copied to Pfingst and never regained possession of it. In an excess of zeal, which almost caused a mistrial on the spot, the prosecutor "ask[ed] the defendant to produce the signed agreement." The trial court immediately interrupted examination of D'Onofrio, admonished the prosecutor, "We will have no such demand in the future," and told the jury, "The demand should not have been made, the defendant does not have to turn over anything. There is no indication the defendant has any such document in its [sic] possession." Almost

immediately thereafter a recess was declared. The defendant then moved for a mistrial because of the prosecutor's demand. The trial court denied the motion, but again admonished the Assistant United States Attorney (who admitted his error and apologized). At the defense's request when the jury returned the court instructed them:

> Ladies and gentlemen, it was improper for the Government attorney to make any such demand on the defendant, as I told you earlier, not only for the reasons I indicated, that is that the defendant is not obligated to produce anything, which I indicated at the outset of the case, and no inference against a defendant may be drawn from the fact that he doesn't produce anything. It is not his obligation.

> But more important in this particular instance there is no evidence at all that the defendant had the original of these documents.

The prosecutor, at the defense's request and under the guidance of the trial court, then recounted to the jury the Government's efforts to obtain the original, which established that Pfingst had not been asked previously to produce it. The court then admitted Exhibit 14 with an appropriate cautionary instruction as to its weight.[6] A post-verdict new trial motion based in part on the prejudice allegedly flowing from the demand was denied, erroneously appellant submits here.

The Government quite properly concedes that the demand was erroneous. It obviously violated the principle that the burden is on the Government to prove the defendant's guilt beyond a reasonable doubt; it also goes to the de-

---

6. The instruction was as follows:

I am allowing that to come in for whatever value you find in it. But bear in mind that we prefer to have the original document for obvious reasons because there could be changes between the original and the copy. In addition, we have a problem with respect to this document —I mean this physical document—because we haven't traced it. And there is a possibility, which you can consider, that during the interim it was changed or modified, or perhaps it wasn't even the original that was described. But I am allowing it to go into evidence for whatever evidentiary probative force you find it has.

fendant's privilege against self-incrimination. *See generally* 8 J. Wigmore, Evidence § 2264 at 379 (McNaughton rev. 1961); Rex v. Purnell, 1 Black W. 37, 45, 96 Eng.Rep. 20, 23 (K.B. 1749); *see also* State v. Squires, 1 Tyler 147 (Vt. 1801). There remains, however, the question whether the error was serious enough to require a new trial. In deciding this question we must consider, in the circumstances of this case, the degree of prejudice created in the minds of the jurors by the demand, the quality and forcefulness of the trial judge's corrective action and the strength of the Government's case. United States v. Semensohn, 421 F.2d 1206, 1208–1209 (2d Cir. 1970). We might also consider the value a remand for a new trial might have as a deterrent to the United States Attorney to avoid such errors in the future for:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

The degree of prejudice flowing from the demand was minimal. The prosecutorial misconduct did not irreparably weaken the appellant's or a key witness's credibility, *see* United States v. Semensohn, *supra*, 421 F.2d at 1209; United States v. C. L. Guild Construction Co., 193 F.Supp. 268, 274 (D.R.I.1961), or some other critical element of the defense. Rather, viewed in perspective the demand was a minor, isolated incident near the beginning of a long and complex trial. We agree with Judge Weinstein that "It is impossible to try any case, particularly a case of this nature, without having things occur which others might prefer not to have occur" and that in "A case as complex and well tried as this, and tried over as many days, all of these minor things just wash out." *Cf.* Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953).

Our conclusion that the prejudice to appellant was minimal is reinforced by the strong curative action of the district court. The court's statements left no doubt that the prosecution was in error or as to what the nature of the error was. *Cf.* United States v. Semensohn, *supra*, 421 F.2d at 1209. If curative instructions ever have any effect in dispelling prejudicial conduct by a prosecutor they certainly would have that effect in this case. *Cf.* United States v. Sawyer, 469 F.2d 450 (2d Cir. 1972).

Our conclusion that the prejudice was minimal is also reinforced by the quantity and quality of the evidence against appellant, the sufficiency of which he does not contest here. This is not a case where that evidence was of such questionable weight that doubt exists as to whether the case should have been submitted to the jury altogether. Ample documentary evidence and testimony exists to support appellant's conviction. We thus do not fear that the prosecutor's improper conduct may have tipped the scales of justice against appellant. *See* Berger v. United States, *supra*, 295 U.S. at 88–89, 55 S.Ct. 629.

Finally, we consider the need for deterring the Assistant United States Attorney from making a similar demand in the future. We reject out of hand appellant's contentions that the demand was part of a deliberate plot by the prosecutor to prejudice the jury against him. The demand was made—whether out of incognizance, anger or, indeed, frustration—spontaneously under the pressure of an unexpected best evidence objection. Despite appellant's other contentions of misconduct by the prosecutor, we see no support in the record for appellant's insinuations of a pattern of deliberate prosecutorial misconduct with a cumulative prejudicial effect on his trial. *Cf.* Berger v. United States, *supra*, 295 U.S. at 84–89, 55 S.Ct. 629.

We see no need whatsoever for further deterrent action as the Assistant United States Attorney has been warned by the district court and has freely admitted the error.

■ Appellant also points to a portion of the Government's summation quoted below [7] which he claims referred back to the demand, and, when taken in combination with the demand, allegedly prejudiced appellant. Despite numerous other objections during the Government's summation, appellant did not object to the statement he questions here. Nonetheless, immediately after the prosecutor made it, the trial court sua sponte warned him to be careful not to tread on the appellant's presumption of innocence. When examined in context, the prosecutor's argument objected to here was simply part of a larger (and otherwise certainly proper) argument about the difficulties of investigating and proving the kind of crime with which Pfingst was charged.

■ D. *Testimony of the expert accountant.* Appellant alleges that the testimony of Matthew Lippman, a lawyer and accountant, called by the Government as an expert witness, was so misleading as to constitute part of the alleged deliberate prosecutorial plot to prejudice appellant. Lippman's testimony was, however, offered for a legitimate purpose, to show the jury the bankrupt condition of the Evans dairy business during the course of the crimes charged. That Evans Amityville was bankrupt on February 28, 1966, at the date of its acquisition by D'Onofrio and Pfingst was an element of the Government's case and no malevolent purpose can be ascribed to the Government for trying to establish that fact. The trial court permitted Lippman to testify as a qualified expert witness and appellant does not dispute that ruling here. Once Lippman was permitted to testify the weight to be given his testimony was a matter for the jury. Appellant was afforded a full opportunity to cross-examine Lippman at trial and, in fact, according to appellant, cross-examination totally discredited his testimony. Appellant could also have called his own expert accountant if further refutation of Lippman's testimony were needed. Appellant's objections to Lippman's testimony in reality go to the possible role it played in convincing the jury of appellant's guilt.

■■ E. *Improper summation.* Appellant complains that portions of the prosecutor's summation deliberately and erroneously implied that the jury did not have to believe D'Onofrio to convict Pfingst. Again, when read in context, however, these statements were part of a legitimate argument that on certain key issues of fact documentary evidence supported D'Onofrio's testimony. In other parts of his summation the prosecutor argued that D'Onofrio should be believed by the jury. The trial court found the summations on both sides to be "highly professional and restrained." But even if the trial judge were wrong and marginal error did creep into the prosecutor's summation the instruction given that D'Onofrio's testimony was "crucial" to the Government's case and could be accepted or rejected in whole or in part mitigated the effect of any error. Under the circumstances, the claim of reversible error owing to improper summation must be rejected.

■ F. *Testimony of FBI Agent Scuderi.* The Government called FBI Agent Scuderi, the chief investigating officer in the Evans Dairy affair, to the wit-

---

7. The part of the summation of which appellant complains reads as follows:
Mr. Marcheso [defense counsel] talked to you about all the documents and that we had people who were interviewed. But, what do you think would happen when an FBI agent goes to one of the two men, and these are intelligent men; intelligent men, and one of them is a lawyer, he knows what proof is in court. He knows that in a criminal case he can't be found guilty unless someone proves his guilt to a Jury of lay people beyond a reasonable doubt? So what do you think happens? What would you expect?

ness stand.[8] Very early in his testimony the defense argued, and the trial court agreed, that Scuderi should not be allowed to testify about a meeting he had with D'Onofrio, with appellant present. After the defense's objection was sustained, on the basis that Pfingst's fifth amendment privilege would be violated, Scuderi's testimony was quickly ended. Appellant claims that the prosecutor knew Scuderi's testimony was inadmissible and deliberately sought to make it appear that the defense did not want the jury to hear about the meeting. Thus, according to appellant, calling Scuderi "constituted prejudicial insinuations concerning appellant's right to remain silent."

The Government asserts that it had legitimate reasons to call Scuderi that negate any inference of deliberate misconduct. It rather weakly claims that Scuderi in describing the circumstances of the FBI interview of D'Onofrio on April 14, 1967, at which Pfingst was present, would have helped to negate the defense's contention that Pfingst did not become a subject of investigation until he became a Supreme Court Justice some two years later. The Government is on much more solid ground in reference to testimony relative to milk delivery records it intended to offer through Scuderi. A stipulation was ultimately entered into making the milk delivery records admissible without Scuderi's testimony, but absent that stipulation his testimony might well have been necessary. The Government's claim that testimony by Scuderi about evasive conduct by Pfingst at the interview was admissible to show Pfingst's consciousness of guilt is a question we need not decide, although it appears highly debatable. *Cf.* United States v. Semensohn, *supra,* 421 F.2d at 1209–1210; see generally 8 J. Wigmore, *supra* § 2263 at 378. Judge Weinstein's caution was the better part of judicial valor. Though the admissibility of Scuderi's testimony is doubtful, it is certainly not evidence of prosecutorial bad faith.

G. *The 75–25 "hoax."* Appellant next claims that the prosecution deliberately introduced false and misleading evidence that D'Onofrio and Pfingst were 75–25% partners in the Evans dairy business. To support these allegations appellant argues that D'Onofrio's testimony that a February 28, 1966, issue of 484 and 485 shares of W. M. Evans stock to D'Onofrio and Pfingst respectively was false, because D'Onofrio had never surrendered back to the company his stock certificates from which the February 28 issuance was made. Thus the certificates were, appellant argues, "meaningless pieces of paper." Appellant chooses to ignore the evidence that these certificates were in Pfingst's handwriting and that the stubs as well as the two certificates relating to D'Onofrio's alleged ownership were missing. There were indeed various inferences that the jury could draw from what was and was not in the W. M. Evans stock book. Appellant made his points on cross-examination to D'Onofrio and in summation. If the jury did not credit them, it might have been because the jury thought that as a lawyer apparently in charge of the stock book appellant wouldn't have written up the certificates unless they had some meaning. Furthermore, appellant's "hoax" argument ignores the fact there was substantial evidence other than the stock book—including Exhibit 14, see Point IC and footnote 2 *supra*—from which the jury could have concluded D'Onofrio and Pfingst were in fact partners in the Evans dairy business. There was no prosecutorial misconduct.

H. *The prosecution's "deal" with D'Onofrio.* Appellant claims that

---

8. At trial, appellant objected to Scuderi's presence at the Government table during the trial. The court rejected the application to exclude him, on the grounds that Scuderi was of significant help to the prosecution during trial. *See* United States v. Pellegrino, 470 F.2d 1205, 1208 (2d Cir. 1972). Appellant does not, apparently, renew his objection on this ground here.

the prosecutor failed to reveal that D'Onofrio and the Government had a mutually beneficial understanding that in return for D'Onofrio's testimony against Pfingst D'Onofrio would receive lenient treatment for his numerous sins. Failure to reveal evidence of such an understanding would, of course, violate due process and require a new trial, for evidence of any understanding would have significantly aided the defense's position on the critical issue of D'Onofrio's credibility. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). *See generally* Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant vigorously claimed that a "deal" had been made during cross-examination of D'Onofrio and in summation. The trial court also instructed the jury:

> Mr. D'Onofrio is a self-confessed criminal. If you believe that Mr. D'Onofrio was induced to testify in this case by any promise of immunity, or that any hope was held out that he would be rewarded or in any way benefit if he implicated the defendant in the crime charged herein, or if he believed he would so benefit even if no such promises were made, then you may consider the fact in determining what weight to be given to his testimony.

The jury apparently decided, despite appellant's contentions of a "deal," not to reject D'Onofrio's testimony in toto but to credit it when supported by documentary evidence. For this jury's decision we cannot, and would not if we could, provide appellant a remedy. The Government continues to deny strenuously any such understanding between itself and D'Onofrio on this appeal.

Despite the above, appellant asserts six "facts" which he claims makes the Government denial of a deal "fl[y] in the face of logic." All of these "facts" were either not asserted below or were rejected by the finder of fact at one time or another. Examination of each, furthermore, reveals no support for appellant's contention that an unrevealed deal was made.

First, appellant argues that the prosecutor "honored" D'Onofrio's refusal to reveal any information about his secret Swiss bank accounts despite the fact the Government knew that D'Onofrio had not paid income taxes in years. The Government only "honored" D'Onofrio's privilege against self-incrimination which was persistently asserted—once during the bribery trial to the point of contempt—to thwart all interrogation about Swiss bank accounts. The Government's only alternative was to grant D'Onofrio immunity from prosecution, which it properly determined not to do.

The second "fact" appellant points to is that despite D'Onofrio's failure to testify about the Swiss bank accounts he was allowed to plead guilty to only one count of the ten-count bankruptcy indictment. D'Onofrio, however, still could have received a five-year sentence on the one count and a plea on all ten counts would very likely not have resulted in a longer jail term.

Third, appellant argues that D'Onofrio's presentence report failed to disclose many of D'Onofrio's criminal activities and, as a result, he received a suspended sentence. As previously mentioned, the timing of D'Onofrio's sentencing was at appellant's request. Appellant's counsel did not ask to see D'Onofrio's presentence report before the sentencing even though, as Judge Weinstein later stated, the judge might well have been willing to show it to him. Nonetheless, a prosecutor has a duty to reveal matters to the court which are relevant to proper sentence whether or not favorable to the defendant. This includes the duty to reveal a plea bargain. ABA Standards Relating to Sentencing Alternatives and Procedures § 5.3(d) (i)(A) and Commentary (1968). The evidence in the record does not disclose that the prosecutor failed to meet

his obligations here. The presentence report contains general information relating to D'Onofrio's background and finances as well as a description and evaluation of his participation in the bankruptcy scheme. Appended to the presentence report are letters from the SEC and the IRS mentioning their investigations into D'Onofrio's activities. Indeed, had the presentence report furnished more data, it might have approached the bounds of what might properly have been contained in it. *See* ABA Standards Relating to Probation § 2.3(ii)(B) and Commentary (1970) (investigations and other involvement in the criminal process short of an adjudication of guilt should be included in a presentence report with care, if included at all, because of danger they will mislead the sentencing authority). Furthermore, as discussed at Point IVA *infra,* Judge Weinstein was familiar with an FBI report describing some of D'Onofrio's possibly illicit activities in areas unrelated to the bribery or bankruptcy cases, having decided not to disclose it to the defense prior to the date of D'Onofrio's sentencing. The only substantial information of which Judge Weinstein was unaware consists of the details of D'Onofrio's relationship to the Swiss bank accounts. Familiarity with both the bankruptcy and bribery cases, however, certainly must have made the judge well acquainted with D'Onofrio's Swiss manipulations even if he was not aware of their full extent. Nothing in the record supports the contention that D'Onofrio's sentence would have been different had Judge Weinstein been further aware or that the Government somehow tailored the presentence report to avoid disclosure of information.

Fourth, appellant points to the fact that D'Onofrio was not indicted in the bribery case. But there was no evidence that D'Onofrio personally profited from the bribe. When the same argument was presented at the bankruptcy trial Judge Weinstein commented: "[D'Onofrio is] way at the outskirts of the central conspiracy . . . it would be insane for the prosecutor to indict people under those circumstances."

Fifth, appellant contends D'Onofrio was not indicted for perjury even though the Government knew that he lied in testimony before the Securities and Exchange Commission. Until D'Onofrio disclosed the bribery scheme, however, on January 6, 1971, there was no evidence to support a perjury charge.

Sixth, appellant points to a statement made by D'Onofrio's attorney during the bankruptcy trial that there was an understanding that D'Onofrio would not have to give information about his Swiss bank accounts if he testified against Pfingst. The statement by D'Onofrio's attorney, however, in context was *only* that D'Onofrio was excused from testifying about the Swiss bank accounts if he had justification (such as a self-incrimination privilege).

Nonetheless in support of the argument that a less legitimate "understanding" existed, appellant points out that the Government refused to seek a contempt order when, despite Judge Weinstein's rejection of D'Onofrio's claim of a fifth amendment privilege, D'Onofrio refused to disclose information as to the Swiss bank account "Gypsy" during the bribery trial. Rather, the court sua sponte ordered D'Onofrio to be held in contempt. The Government's failure to seek a contempt order is probably explained by the fact that, although it wanted information on "Gypsy," to seek a contempt order would have undercut its argument that "Gypsy" was immaterial to the bribery charges against Pfingst. If the materiality of "Gypsy" was enhanced Pfingst might well have been granted a mistrial or dismissal because D'Onofrio's refusal to testify would have made effective cross-examination on a material issue impossible. *See* United States v. Cardillo, 316 F.2d 606, 610–613 (2d Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). The Government's problem would have been solved had D'Onofrio agreed to testify about "Gypsy" and,

in fact, the Government vigorously supported Judge Weinstein's order of contempt on appeal.

Thus, all of appellant's alleged "facts" which he claims unequivocally establish that an unrevealed understanding was made between the Government and D'Onofrio do not do so. Additionally, two criminal indictments are pending against D'Onofrio in the Southern District of New York for securities law violations, further undercutting any indication of a "deal." [9] Appellant had necessary latitude in making his insinuations about the D'Onofrio-Government relationship during trial. Despite his allegations here he was entitled to nothing more.

 While appellant's claims as to prosecutorial misconduct range from the somewhat meritorious to the frivolous, none constitutes sufficient grounds to reverse appellant's conviction. We also reject appellant's argument that the cumulative effect of prosecutorial misconduct requires reversal. Both the pretrial publicity and the prosecutorial "demand" should have been better handled by the United States Attorney. But we find no support for appellant's insinuations that he was a victim of a conspiracy of the prosecutor's office.

III. Trial Court's Refusal to Rule in Advance on Scope of Cross-Examination of Pfingst.

 Appellant contends that the trial court erred when it refused to rule in advance that if appellant testified the Government would be precluded on cross-examination from inquiring into the relationship between appellant and D'Onofrio in certain Swiss bank transactions subsequent to the bankruptcy fraud. Appellant argues that this ruling prevented him from taking the stand which, in turn, was "[t]he single critical fact" that gave rise to his conviction. If appellant had taken the stand without the advance ruling, he argues, refutation of the damage done by cross-examination about the subsequent Swiss bank account dealings would have required revelation of his defense in the upcoming bribery trial. To quote appellant: "Giving a pathological liar like D'Onofrio such an advantage [the advance revelation of the bribery defense] would have enabled D'Onofrio to invent a new and different story for the bribery trial." Appellant thus claims that the trial court's refusal to rule in advance was error and that he should be granted a new trial where he can "defend himself."

 The fact that appellant would have had to preview his bribery trial defense is unfortunate but was a product of the defense's own strategy. After all, it was Pfingst who insisted that the bankruptcy trial precede the bribery trial. Be that as it may, this court has often held that while a trial court has discretion to issue an advance ruling on the scope of cross-examination, United States v. Palumbo, 401 F.2d 270 (2d Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed. 480 (1969), it need not do so, United States v. Cacchillo, 416 F.2d 231, 234 (2d Cir. 1969); United States v. Crisona, 416 F.2d 107, 117 (2d Cir. 1969), cert. denied, 397 U. S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253 (1970), even if the refusal to do so prevents a defendant from testifying in his own behalf. United States v. Kahn, 472 F.2d 272 at 281, 282 (2d Cir., 1973). The test for appellate review is whether the trial court abused its discretion in failing to issue an advance ruling. United States v. Kahn, *supra,* at 282; United States v. Crisona, *supra,* 416 F. 2d at 117.

Appellant argues in effect that the trial court did abuse its broad discretion because cross-examination about the Swiss bank accounts would have been based on events subsequent to and dissimilar from the acts of bankruptcy fraud and thus would be "collateral" and

---

9. D'Onofrio, recently a fugitive from justice, has now apparently been apprehended in England but has not yet been extradited.

irrelevant. He concedes, as he must, that evidence of the nature of the D'Onofrio-Pfingst relationship before and during the alleged bankruptcy fraud conspiracy was admissible, *see* United States v. Ross, 321 F.2d 61, 67 (2d Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963); United States v. Kahaner, 317 F.2d 459, 470–472 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963), to refute Pfingst's "only a lawyer" defense. We see no distinction between prior and subsequent acts establishing the nature and quality of the Pfingst-D'Onofrio relationship in this regard. 2 J. Wigmore, *supra*, § 382 at 321–24; *cf.* United States v. Chase, 372 F.2d 453, 460–461 (4th Cir.), cert. denied, 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 627 (1967) (similar conspiratorial acts subsequent to original conspiracy admissible against conspirator to show willingness to participate in original conspiracy and intent to advance its purpose even though not admissible against coconspirators whose criminal activities ceased with original conspiracy). Had the acts on which the Government sought to cross-examine been completely irrelevant to the Pfingst-D'Onofrio relationship, *cf.* United States v. Beno, 324 F.2d 582 (2d Cir. 1963), cert. denied, 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 86 (1964), appellant's claim might be in a different posture here. Under the circumstances, however, the trial judge certainly did not abuse his discretion in refusing to restrict the scope of the possible Government cross-examination of Pfingst in advance of Pfingst's direct testimony.

## IV. Trial Court's Rulings Withholding Information From the Defense.

Appellant contends that the trial court's refusal to order disclosure to the defense of three pieces of information constitutes reversible error. We consider each contention separately.

■ A. *FBI report dated July 17, 1970.* An FBI report of July 17, 1970, deals with the FBI's first interview with D'Onofrio after he decided to cooperate with the Government. The first page and one-half were made available to defense counsel by the trial court with the Government's consent since it bore on D'Onofrio's state of mind in seeking to assist the FBI, albeit in an investigation unrelated to the bribery or bankruptcy case. Judge Weinstein did not order disclosure of the remainder of the report because he found that disclosure would put D'Onofrio in danger of his life. He also found that since the report dealt with an unrelated investigation appellant was not prejudiced by its non-disclosure and at best the material in it was cumulative on the issue of D'Onofrio's credibility.

Following standard procedure, *see* 18 U.S.C. § 3500(c), the report was sealed but made available to us to consider the correctness of the trial judge's ruling. We have reviewed the report and conclude that further disclosure might indeed have placed D'Onofrio in danger of his life. We also conclude that the report had no relationship to the appellant whatsoever and that it was of almost no benefit to the defense. We thus reject appellant's contention that a mistrial was required for its non-disclosure. *Cf.* 18 U.S.C. § 3500(d) (trial court has *discretion* to declare a mistrial in the interests of justice when Government refuses compliance with discovery).

■ B. *The FBI reports relating to the obstruction of justice investigation.* After the bankruptcy indictment both D'Onofrio and appellant were approached separately by a shady character named Sidney Orefice who claimed to be able to "fix" their cases. Appellant and his counsel immediately reported the incident to the FBI and cooperated in the ensuing investigation. D'Onofrio also reported the incident to the Government. At trial defense counsel argued that Orefice's approach to appellant was a "set-up" attempt by D'Onofrio. The Government consented to turn over to the defense all of the FBI reports on the Orefice matter that contained statements of appellant, his

counsel or of D'Onofrio. The Government, however, refused to turn over the reports involving interviews of other witnesses on the grounds that investigation into the matter was still going on. The trial court agreed with the Government's position, calling the whole affair "collateral" and "a lot of red herrings." The court and counsel then agreed on a stipulation to the jury describing the approach to both D'Onofrio and appellant and their reporting of it to the Government.

Appellant asserts that the failure of the trial court to order disclosure of the rest of the FBI reports on the Orefice investigation was error. We agree with the trial court that the whole matter was collateral to the main issues at trial. Appellant was given the material which most directly bore on D'Onofrio's credibility. Additionally, the trial court was quite generous in allowing the defense to bring the whole matter to the attention of the jury. Appellant was entitled to nothing more. *See* United States v. Cardillo, *supra,* 316 F.2d at 615–616.

■ C. *The prosecution memoranda.* Appellant asks this court to review the trial court's determination that the defense was entitled to discovery under the Jencks Act, 18 U.S.C. § 3500, of only portions of two prosecution memoranda. Both memoranda were prepared by Gavin W. Scotti, an attorney for the Department of Justice who assisted the prosecution at trial. We have reviewed the memoranda *in camera* and have concluded the defense obtained all the discovery to which it was entitled. All of the portions of the memoranda describing D'Onofrio's interviews with Scotti were disclosed. The non-disclosed portions consist solely of summaries and evaluation of the evidence and a discussion of the legal and practical problems of a prosecution from the Government's point of view. Stripped of the description of D'Onofrio's interviews the memoranda were not "statement[s] . . . made by a Government witness . . . to an agent of the Government" and dis-

coverable under 18 U.S.C. § 3500. *See* Saunders v. United States, 114 U.S. App.D.C. 345, 316 F.2d 346, 349–350 (1963), cert. denied, 377 U.S. 935, 84 S. Ct. 1339, 12 L.Ed.2d 299 (1964); United States v. Aviles, 315 F.2d 186, 191–192 (2d Cir.), remanded sub nom., Evola v. United States, 375 U.S. 32, 84 S.Ct. 24, 11 L.Ed.2d 106 (1963), opinion on remand, 337 F.2d 552 (2d Cir. 1964), cert. denied, 380 U.S. 906, 918, 85 S.Ct. 885, 13 L.Ed.2d 794 (1965).

V. Absence of the Trial Court.

The trial judge had a longstanding invitation to deliver a speech to the Fifth Circuit Judicial Conference on April 27, 1972. He informed counsel early in the trial of this engagement and of the fact that the speech would be delivered in Savannah, Georgia. The trial judge apparently assumed the trial would be over by the day of the speech but events did not bear out his hopes.

Jury deliberations began in this case at about 10:30 a. m. on the day before the speech was to be delivered. Remembering the speech date, on the day jury deliberations began defense counsel sought to make arrangements to deal with the trial court's absence. Apparently, however, he was told in an off the record discussion that no arrangements were necessary.

The jury resumed deliberations at 10:30 a. m. on the day of the speech with the trial judge in Savannah. The trial judge made arrangements to return to the courtroom at approximately 2:00 p. m. that day. At 11:00 a. m., however, one of those marvelous notes that only a jury can devise was handed to the Marshal by the jury asking: "What type and what amount of proof and evidence is required to eliminate reasonable doubt?" The note was given to the trial judge's law clerk. The trial judge, who had made arrangements to be in telephonic communication with his law clerk throughout the morning, was informed of the note at 11:30 a. m. He instructed his law clerk to research some of the points raised by it. He further

instructed him to advise counsel of the contents of the note and prepare proposed answers by 2:10 p. m. Counsel was shown the note at 11:40 a. m. and told of the judge's instructions.[10] Five minutes later, the jury went to lunch.

Jury deliberations resumed at 1:45 p. m. Shortly before that time, approximately 1:30 p. m., the Government's proposed answer to the note was given to the judge's law clerk. The trial judge, who had worked on an answer to the note during the trip back from Georgia, returned to the courthouse at approximately 2:30 p. m.[11] and was given the Government's proposed answer. He assumed the bench at 2:35 p. m. At about 2:45 p. m. the defense's proposed answer was received. A colloquy then ensued between counsel and the court. The trial court rejected both his own draft and the Government's proposal and delivered almost verbatim the defense's proposed answer to the note at 3:00 p. m.[12] The jury was thus without answer to its reasonable doubt note for just over two hours of deliberation time. Ten minutes after the answer was read, the jury returned its verdict convicting appellant on some but not other counts of the indictment.

Appellant first contends that this sequence of events requires reversal of his conviction without any showing of specific prejudice because the absence of the trial court from the courtroom was per se error, because it made him unable to "assert authority" over the situation. We reject the contention that no showing of specific prejudice is required. While delivering a speech in Georgia under the circumstances may have been unwise, Judge Weinstein was able to "assert authority" over the situation by telephone and evidence in the record establishes that the procedure he followed in responding to the jury's note was no different, except that it was slower, from the procedure he would have followed had he been physically present. Judges, for various reasons, are sometimes physically absent for short periods from the courthouse during jury deliberations. *See* Jordon v. Bondy, 72 App.D. C. 360, 114 F.2d 599, 605 (1940) (jury deliberates late into night, judge goes home); United States v. Lanni, 335 F. Supp. 1060, 1083 (E.D.Pa.1971) (attendance at a bar association luncheon during jury deliberations). *Cf.* Heflin v. United States, 125 F.2d 700 (5th Cir.), cert. denied, 316 U.S. 687, 62 S.Ct. 1276, 86 L.Ed. 1759 (1942). While the practice is not to be encouraged, we cannot say in this day and age of modern communication and transportation it is re-

10. The statement of facts of the incident is drawn from memoranda dictated by the trial judge, his law clerk and the deputy court clerk shortly after defense counsel moved for a mistrial based on the delay in answering the reasonable doubt note. Appellant submitted no contradictory evidence. There is simply no support in the record for the implication in appellant's brief that he prepared an answer to the note by 11:15 a. m. but was unable to submit it to the court until 2:40 p. m. Furthermore, appellant's assertion contradicts the statements in the three memoranda that the note was not shown to counsel until 11:40 a. m. No reason appears why appellant could not, as did Government counsel, submit his prepared answer to the trial court's law clerk had he had it ready at 11:15 a. m.

11. Another request for instructions was given to the court at approximately this time. The issues this request raises are discussed at Point VI *infra*. There is no claim made of undue delay in answering this second note.

12. The trial court charged as follows :
 The concept of reasonable doubt is personal to each juror.
 A reasonable doubt can arise from the evidence in the case and from the lack of it.
 If, after considering the whole case, a juror has a reasonable doubt as to the defendant's guilt, such doubt cannot be eliminated by any formula as to the type and amount of evidence in the case. In such a case the juror must find the defendant not guilty.
 If you have no reasonable doubt, you will find him guilty of any count. If you have a reasonable doubt, you will find him not guilty of any particular count.

versible error for the trial court not to be physically present at the courthouse during deliberations for a reasonably short period without some showing of specific prejudice to a defendant.

Additionally, however, appellant contends that he was specifically prejudiced by the delay in responding to the jury's request. A trial judge should, of course, generally provide prompt additional instructions upon request from a jury. ABA Standards Relating to the Function of the Trial Judge § 5.12(a) (ten. draft 1972). Here, the jury deliberated some two hours without an answer. It is difficult to know what effect an earlier response to the broad question on reasonable doubt would have had on the course of jury deliberations. We note again, however, that Judge Weinstein followed his usual procedure in answering the jury's note and that he properly advised counsel of the note and requested their assistance in answering it. *Cf.* ABA Standards Relating to Trial by Jury § 5.3(d) (1968) incorporating by reference *id.* § 4.6(c) and (e). We also note in passing that there are decisions upholding verdicts rendered by a jury even if a requested further instruction is not given at all, in effect saying that a jury can waive a request for further instructions. Jordon v. Bondy, *supra,* 72 App.D.C. 360, 114 F.2d at 605; United States v. Lanni, *supra,* 335 F.Supp. at 1083–1086. But here the jury's question *was* answered before verdict. While the time formulation of the answer was quite long, defense counsel himself did not submit a proposed answer to the jury's request until 2:45 p. m., and the question was not without difficulty. Under the circumstances we cannot say that reversible error occurred.

VI. Instruction on Inference.

During the colloquy on the reasonable doubt question the jury sent in a second note, equally ingenuous, asking: "Can a Juror's opinion be based on inference? Please explain what part does presumption play." The court showed counsel the note and requested their comments.

Appellant requested a "two inferences" instruction—that if one inference is consistent with innocence and the other with guilt, the jury must draw the one consistent with innocence—in answer to the jury's note. *See, e. g.,* United States v. Kelton, 446 F.2d 669, 671 (8th Cir. 1971); Battles v. United States, 388 F. 2d 799, 801–802 & n.3 (5th Cir. 1968). The trial judge properly refused to give this instruction, as this circuit has rejected the "two inferences" rule. United States v. Grunberger, 431 F.2d 1062, 1066 (2d Cir. 1970). The court, after reading the answer to the "reasonable doubt" question quoted in note 8 supra, answered the inference note as follows:

Can a juror's opinion be based on inference? Yes, inference on the evidence before you.

To the presumption question, the court answered:

There is no presumption in the case except the presumption that I explained to you during the course of the trial, that is the presumption of innocence. I want you to decide the case on the basis of my instructions and not on the basis of any law you think you know from any prior service as a juror.

Appellant now objects that the answer to the inference question was "over-simplistic" because it did not explain that inferences of guilt had to convince the jurors beyond a reasonable doubt. Appellant's argument forgets that his requested answer to the "reasonable doubt" note had been read just seconds before and that the answer to the presumption question reminded the jury of the presumption of innocence. In any event, the appellant did not object below to the answer to the inference note on the grounds he urges here and that alone is sufficient reason to reject his claim of error. ABA Standards Relating to Trial by Jury, *supra,* § 4.6(c).

VII. Failure to Give a *DeSisto* Charge.

Appellant argues that it was reversible error for the trial court to refuse to charge that D'Onofrio's prior

sworn testimony in other proceedings was admissible not only for purposes of impeachment but as affirmative proof of the facts therein, and cites in support United States v. DeSisto, 329 F.2d 929 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). *DeSisto,* however, applies only to the special problem of a witness who is called to testify to a fact and denies the fact or knowledge of it although he has testified elsewhere with respect to it. In that situation the party who called the witness has no other way of proving that the witness's original story is true except to rely on the prior sworn testimony. United States v. Nuccio, 373 F. 2d 168, 172–174 (2d Cir. 1967), cert. denied, 392 U.S. 930, 88 S.Ct. 2285, 20 L. Ed.2d 1388 (1968). Here, D'Onofrio answered all questions relating to the bankruptcy fraud and admitted that his testimony in the prior proceedings was false. *DeSisto* is thus inapplicable. *See generally* 3A J. Wigmore, Evidence § 1018 at 996–1007 (1970). Additionally, even if *DeSisto* were applicable, there was no charge that the jury could not consider D'Onofrio's prior sworn testimony for all purposes. As such, there would be no prejudice to appellant in denying a *DeSisto* charge. United States v. Gonzalez-Carta, 419 F.2d 548, 552–553 (2d Cir. 1969).

## VIII. Marshal's Communication to the Juror.

Appellant's final contention is that he is entitled to a new trial because a juror was informed by a Deputy United States Marshal that some property may have been stolen from the juror's car. The jurors knew the courthouse was in what was apparently a crime-prone neighborhood and, in fact, three of the jurors during the trial had complained that while traveling from the subway to the courthouse some men had made abusive gestures toward them. At defense counsel's request the judge told the jury they could be protected by the Marshal, that similar incidents had happened to judges of the court and that the incident should be put out of their minds in considering the case.

During the course of the trial one juror drove her car to the courthouse and left it in an open lot. One day during the trial the lot attendant told her that the car might be stolen if left in the lot after dark. At the end of the first day of jury deliberations, the juror wrote a note to the trial court reflecting her concern that her automobile might be stolen. Judge Weinstein responded with a note that she should give the key and description of the car to the Marshal who would try to put it in the court garage. The court's note was called to counsel's attention and defense counsel specifically approved of the court's disposition of the incident. The Marshal received a description of the car from the juror and located it, but found the driver's door and glove compartment open. After putting the car in the courthouse garage the Marshal returned to the courtroom. As the jury was leaving for the night the juror asked the Marshal about her car. She was told that the car was safe and in the building, but asked if there was anything of value in the car. She replied that there was nothing of value but there was a makeup case on the car seat. The Marshal confirmed that the makeup case was still there, but stated that the door and glove compartment had been found open. This was the sum and substance of the whole incident.

The above facts were found at a hearing held by the trial court at which the Marshal, the court clerk and the juror were called as witnesses. The Government had the burden of persuasion in showing that the communication between the juror and the Marshal was "harmless to the defendant." Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954); United States v. Gersh, 328 F.2d 460, 464 (2d Cir. 1964). But there is no requirement, as appellant seems to suggest, that the Government meet its burden in any particular way. Here, the Government did not have to ask any questions at the hearing for the answers to defense counsel's questions established that the juror-Marshal communication was harm-

less to the appellant. After the hearing on these issues defense counsel stipulated that the communications with the juror were in good faith. There is not the slightest indication that the lady in question or any other member of the jury was in any way influenced by the incident. Indeed, jury deliberations continued for another day. Appellant's motion for a mistrial on this ground was properly denied by the trial court.

Having reviewed all of appellant's numerous contentions of error and finding them without merit we would add an additional word. The charges against appellant were of particular public interest, since they involved a man who had been placed in a position of honor dispensing justice. His conviction, just as anyone else's, must be untainted by unfairness. Appellant was convicted by a jury of twelve mature and thoughtful citizens after a hard fought trial in which his interests were fully protected by skillful counsel. Upon review of the record of the trial we are convinced that the result was reached by procedures that were, all in all, a credit to the jury system.

Judgment affirmed.